**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**
**www.flsb.uscourt.gov**

In re:                                                    Case No. 23-14383-SMG
                                                          Chapter 11

DIAMANTE ENTERPRISES, LLC,

      Debtor-In-Possession.

_____/

**DEBTOR-IN-POSSESSION'S <u>EXPEDITED</u> MOTION FOR ENTRY OF**
**ORDER (A) AUTHORIZING THE PRIVATE SALE OF REAL PROPERTY**
**LOCATED AT 2943 W MASTER ST, PHILADELPHIA, PA 19121 PURSUANT**
**TO 11 U.S.C. § 363, FREE AND CLEAR OF ALL LIENS, CLAIMS, AND**
**ENCUMBRANCES; (B) AUTHORIZING EXECUTION OF ANY AND ALL**
**DOCUMENTS TO EFFECTUATE CLOSING OF THE SALE; AND**
**(C) AUTHORIZING PAYMENT OF ALL EXPENSES, FEES AND COSTS**
**<u>ASSOCIATED WITH THE SALE CONFIRMATION THROUGH CLOSING DATE</u>**

*EXPEDITED HEARING REQUESTED*
*IF APPROVED, THE ORDER NEEDS TO BECOME A FINAL ORDER NO*
*LATER THAN SEPTEMBER 8, 2023; OTHERWISE, BUYER IS ALLOWED*
*TO RESCIND HIS OFFER AND CANCEL THE PURCHASE*

---

<u>NOTICE TO LIEN, CLAIM, AND INTEREST HOLDERS</u>

**THROUGH THIS MOTION THE DEBTOR SEEKS**
**AUTHORITY TO ENTER INTO AN AGREEMENT TO SELL**
**REAL PROPERTY OF THE DEBTOR LOCATED 2943 W**
**MASTER ST, PHILADELPHIA, PA 19121.**

**FAILURE TO OBJECT TO THIS MOTION WILL BE DEEMED**
**KNOWING CONSENT TO THE SALE DESCRIBED THROUGH**
**THE MOTION AND ITS EXHIBITS.**

---

Diamante Enterprises, LLC (the "Debtor"), by and through undersigned counsel and

pursuant to 11 U.S.C. § 363(b)(1), files this *Motion for Entry of Order Authorizing Debtor To*

*Enter Into Agreement To Sell Real Property* (the "Motion"), and requests this Court enter an order

(a) authorizing the private sale of real property located at **2943 W Master St, Philadelphia, PA**

**19121** (the "Property") free and clear of all liens, claims, and encumbrances; (b) authorizing Debtor to execute any and all documents to effectuate closing of the sale; and (c) authorizing payment of all fees and costs associated with the sale, in support thereof, states as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over the Motion pursuant to 34 U.S.C. § 1334.  This is a core proceeding pursuant to § 157(b)(2)(a), (m), (n) and (o) of the Code.

2.      Venue of this proceeding and Motion are proper pursuant to 28 U.S.C. § 1409.

3.      The statutory bases for the relief sought herein are 11 U.S.C. § 363 and Rules 6004 and 9014 of the Federal Rules of Bankruptcy Procedure.

## BACKGROUND

4.      The Debtor, Diamante Enterprises, LLC, was established in December 2017 with the primary objective of buying, selling, and leasing real estate. Debtor specializes in wholesale transactions, where properties are placed under contract and subsequently assigned to final purchasers.

5.      On February 5, 2018, Debtor purchased the Property with financial assistance from Gelt Financial, LLC ("Gelt"). The Property is a mixed-use property suitable for commercial and residential use.

6.      The funding provided by Gelt was intended for the purchase and renovation of the Property. However, upon loan approval, Debtor realized the funds were only sufficient for the purchase of the Property and it would have to find additional funding to renovate the Property. Debtor encountered unexpected complications attempting to secure renovation funds because, as a result of the COVID-19 pandemic ("COVID-19"), lenders were not funding real estate transactions. Debtor attempted to refinance to provide some resolve, but was denied refinancing

because lenders would not refinance unless Debtor agreed to convert the Property from mixed-use to entirely commercial; issues with the zoning further complicated a potential refinance.

7.      The delay in renovations delayed Debtor's ability to timely flip the Property for profit. Gelt worked with Debtor to extend the maturity date of the loan to January 2021 to provide additional time for the renovation process. However, COVID-19 continued to adversely affect the economy and in turn affected Debtor's ability to make timely payments on Gelt's loan.  The Debtor and Gelt entered into a forbearance agreement in October 2022 and agreed to extend the maturity date to December 31, 2022. When Debtor was unable to tender payment in full on the maturity date, Gelt deemed Debtor in default and foreclosed on the Property in May 2022 through a complaint in confession of judgment in the amount of $236,450.02 (Exhibit A).

8.      Debtor made good faith payments to reduce the judgment amount and prevent the sheriff sale on the Property. Debtor placed the Property on the market for private sale to capture the equity in the Property. Unfortunately, the potential buyers backed out of the sale and Debtor's business was not generating enough cash to pay off the judgment prior to the schedules sheriff's sale on June 6, 2023. As a result, Debtor filed this bankruptcy on June 5, 2023.

## Procedural History

9.      Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "Code") on June 5, 2023 (the "Petition Date") (DE 1).

10.      The meeting of creditors was held on July 26, 2023.

11.      As of the date of this Motion, Debtor has not filed a plan.

12.      Debtor is currently operating its business as the debtor-in-possession pursuant to §§ 1181 and 1184 of the Code.

**13.**      The Debtor's schedules valued the Property at **$235,446.00**, which was the average value of four real estate websites and the Philadelphia property appraiser.

**ARGUMENT**

14.     On July 8, 2023, the Debtor received an offer from BSAJ LLC (the "Buyer") on the Property for **$245,000.00**. The parties agreed to the terms of sale as outlined in the purchase and sale agreement (the "Agreement") (Exhibit B). The Agreement provides that there shall be an initial deposit of **$5,000.00** and the remaining **$240,000.00** to be financed by the Buyer. By addendum executed on July 27, 2023 providing for a $3,500.00 credit to the Buyer due to newly discovered complications with the HVAC system (Exhibit C). The final agreed upon purchase price is **$241,500.00**.

15.     The proposed sale is an arms-length transaction, and neither the Buyer, nor any of its member(s), are insiders of the Debtor.

16.     The Court should authorize the proposed sale because (1) Debtor believes it is the best offer that Debtor will receive for the Property; (2) the prompt sale will maximize the Property's value and derive the most benefits for the estate; (3) the proceeds from the sale will allow Debtor to satisfy its obligation to one of its largest secured creditors and result in a surplus to be distributed to the remaining valid claims on the Property, if any; and (4) the secured claim on the Property will be adequately protected and receive as much protection as they would under a plan.

**Legal Authority**

17.     Section 363(f)(4) of the Code provides, "the trustee may sell property under subsection (b) of this section free and clear of any interest in such property of an entity other than the estate, only if such interest is in bona fide dispute . . . ." 11 U.S.C. § 363(f)(4). Although the Code does not define "bona fide dispute," case law has defined it as "a genuine issue of a material fact that bears upon the debtor's liability, or a meritorious contention as to the application of law

to undisputed facts." *In re Deluxe Bldg. Sols., LLC and B.D.W. Assocs., Inc. v. Busy Beaver Bldg. Ctrs., Inc.*, 865 F.2d 65, 66 (3d Cir. 1989). Bankruptcy courts have held that the standard for determining if a bona fide dispute exists is, "whether there is an objective basis for either a factual or a legal dispute as to the validity of the asserted interest." *In re Daufuskie Island Props., LLC*, 431 B.R. 626, 646 (Bankr. D.S.C. 2010); *see also In re Octagon Roofing*, 123 Bankr. 583, 590 (Bankr. N.D.Ill. 1991) (citing *In re Busick*, 831 F.2d 745, 750 (7th Cir. 1987)). The Court is not required to resolve the underlying dispute, just determine its existence. *In re Collins*, 180 B.R. 447, 452 (Bankr. E.D. Va. 1995); *See, e.g., In re Oneida Lake Dev., Inc.*, 114 B.R. 352, 358 (Bankr. N.D.N.Y. 1990).

18.    The goal of Section 363(f)(4) is to "'allow the sale of property subject to dispute so that liquidation of the estate's assets need not be delayed while such disputes are being litigated.'" *In re Bella Vista Associates, LLC*, 388 B.R. 99 (Bankr. D.N.J. 2008). "There are times when it is more advantageous for the debtor to begin to sell as many assets as quickly as possible in order to ensure that the assets do not lose value." *Florida Dept. of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33 (2008) (Breyer, J., dissenting).

19.    A debtor must demonstrate that a good business purpose necessitates the sale outside of a bankruptcy plan and courts generally defer to a debtor's good business judgment when approving such sales. *See Comm. of Equity Sec. Holders v. Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983).

### Analysis

20.    In the instant case, there are several parties with "interests" in the Property. Gelt has a judgment lien with a remaining balance of **$112,149.82** (Exhibit D). According to the title report prepared for the proposed sale, the City of Philadelphia has in interest in the Property based

on two claims for water totaling **$4,379.94** (Exhibit E). U.S. Bank National Association ("U.S. Bank") also has a judgment lien on the Property for **$484,000.00**—this lien however is in bona fide dispute (Exhibit F).

21.     U.S. Bank's judgment is based on an assigned mortgage originally owned by Velocity Commercial Capital, LLC ("Velocity"). The mortgage was executed between Debtor and Velocity in February 2020 and Velocity assigned the mortgage to U.S. Bank on May 12, 2023. U.S. Bank filed its foreclosure action in Pennsylvania against Debtor in September 2021 and obtained a default judgment against Debtor in February 2023 (Exhibit G).

22.     The validity of U.S. Bank's lien constitutes a bona fide dispute because the underlying mortgage was granted on a property that the Debtor-mortgagor did not own at the time of execution. The mortgage encumbers the real property located at 3030 Redner St., Philadelphia, PA 19121 and 2830 Cecil B. Moore Avenue, Philadelphia, PA 19121; these properties were, at the time of execution, and remain owned by an entity other than the Debtor. Notwithstanding the foregoing, under Pennsylvania law, once the judgment was indexed, U.S. Bank's lien attached to all Debtor's real property located in the county and thus attached to the Property. *See* 231 Pa. Code § 3023(a).

23.     These issues were not litigated and determined in the civil action because U.S. Bank obtained a default judgment. Delaying the proposed sale to litigate and determine the validity of U.S. Bank's lien could adversely affect and delay the satisfaction of Gelt's claim. Debtor made several efforts to sell the Property to satisfy Gelt's judgment prior to filing this bankruptcy and, despite its best efforts, the potential sales fell through due to lowball offers from potential buyers trying to capitalize on Debtor's hardships or from potential buyers not wanting to purchase a property that was encumbered by the Gelt judgment (if the proposed purchase price did not exceed

the full amount owed).

24.    The proposed sale is the culmination of extensive and prolonged efforts to sell the Property. All of Debtor's attempts to sell the Property prepetition failed because the Gelt judgment always clouded title and deterred potential buyers. The purchase price of the proposed is the result of extensive negotiations, is the highest and best offer that the Debtor has received, and it is in line with current market prices. If approved by the Court, the sale will generate the funds necessary for Debtor satisfy its obligations to Gelt and leave an additional **$129,350.00** in proceeds to be distributed to other claimants.

25.    The Debtor, exercising its business judgment, believes that the sale of the Property to the Buyer is in the best interest of the bankruptcy estate. While Debtor is currently still operating its business as debtor-in-possession and generating rent from some of its properties, including the Property, based on Debtor's monthly operating report, the amount of monthly rent generated is de minimis compared to the secured claims on the Property. If the sale is denied and the Debtor must wait to sell the Property through the plan, it will take longer for the secured claims to be paid and affect the amount available to distribute among the unsecured creditors. Moreover, waiting to liquidate the Property through the plan creates the risk that the Property will lose value and become less profitable for the estate.

26.    Finally, the secured creditor's claims will be adequately protected because, even though their liens will be stripped from the Property, their interest in the Property will attach to the proceeds from the sale. These claims will also receive as much protection from the proposed sale than they would through the plan process because the claim holders will receive proper notice, an opportunity to object, and a hearing before their interests are affected.

27.    Accordingly, Debtor requests authority to close the sale and that the Court find that,

at closing, the Buyer will be deemed a good faith purchaser within the meaning of 11 U.S.C. § 363(m), provided that the Buyer complies with all its obligations under the Agreement[1].

      **WHEREFORE** Debtor respectfully requests this Court enter an order (a) granting the Motion; (b) finding that all lienholders received due and adequate service of the Motion; (c) authorizing Debtor to sell the Property; (d) finding that the sale of the Property was entered into with a good faith purchaser pursuant to § 363(m) of the Code; (e) and for any further relief this Court deems proper.

      Dated:  August 10, 2023

                                  **VAN HORN LAW GROUP, P.A.**
                                  500 N.E. 4th Street, Suite 200
                                  Fort Lauderdale, FL 33301
                                  Telephone: (954) 765-3166
                                  Facsimile: (954) 756-7103

                  By: /s/  **Julia Osmolia, Esq.**
                                  Chad Van Horn, Esq.
                                  Florida Bar No. 64500
                                  chad@cvhlawgroup.com
                                  Julia Osmolia, Esq.
                                  Florida Bar No. 1035614
                                  julia@cvhlawgroup.com

---

[1] "Section 363(m) gives purchasers of a debtor's assets an 'assurance of finality' with respect to 'who has rights to estate property.'" *In re TFLO, LLC*, 572 B.R. 391, 433 (Bankr. S.D. Fla. 2016) (citations omitted). The reversal or modification on appeal of a transaction authorized under Section 363(b) of the Bankruptcy Code does not affect the validity of the sale to an entity that acquired the property in good faith. 11 U.S.C. § 363(m).

# EXHIBIT "A"

Amar A. Agrawal, Esquire
Attorney Id. No. 308159
Eisenberg, Gold & Agrawal, P.C.
1040 North Kings Highway, Suite 200
Cherry Hill, New Jersey 08034
(856) 330-6200
Attorney for Plaintiff
File No.: **GF-369-A**



*Filed and Attested by the
Office of Judicial Records
13 MAY 2022 09:45 am
S. RICE*

## IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY, PENNSYLVANIA
## CIVIL ACTION – LAW

Gelt Financial, LLC,

                    Plaintiff,

vs.

Diamante Enterprises, LLC, Danielle Morris, and Diamante Estates, LLC,

                    Defendants.

No.

**ENTRY OF JUDGMENT
AND ASSESSMENT OF DAMAGES**

 

**AND NOW**, this _____ day of _____, 2022, judgment is entered in favor of Plaintiff, Gelt Financial, LLC, and against Defendants, Diamante Enterprises, LLC, Danielle Morris, and Diamante Estates, LLC, and damages are assessed in the amount of Two Hundred and Thirty-Six Thousand Four Hundred and Fifty Dollars and Two Cents ($236,450.02), as follows:

| | |
|---|---|
| Principal | $131,099.40 |
| Interest to 5/16/2022 ($134.59 p.d.) | $ 23,682.10 |
| Late Charges | $ 23,268.74 |
| Modification Fee | $ 19,221.48 |
| Forbearance Fee | $ 10,000.00 |
| Payoff Processing Fee | $  1,500.00 |
| Bank Fee | $    640.00 |
| Servicing Fee | $    250.00 |
| Escrow Refund | ($  7,778.65) |
| Legal and Miscellaneous Costs | $ 34,566.95 |
| **Total as of 5/16/2022:** | **$236,450.02** |

together with interest at the rate of One Hundred and Thirty-Four ($134.59) Dollars and Fifty-Nine

Cents per day until the judgment is satisfied.

**BY THE COURT:**

_____
Prothonotary

Case ID: 220501221

# EXHIBIT "B"



**AGREEMENT FOR THE SALE OF COMMERCIAL REAL ESTATE**                    ASC

Pennsylvania Association of Realtors®

This form recommended and approved for, but not restricted to use by, the members of the Pennsylvania Association of Realtors® (PAR).

---

### PARTIES

| BUYER(S): **BSAJ LLC** | SELLER(S): **Diamante Enterprises**<br>**P.O. Box 268104, Weston FL 33326** |
|---|---|

---

### PROPERTY

PROPERTY ADDRESS **2943 W Master Street**

ZIP **19121** ,

in the municipality of **Philadelphia** ,

County of **Philadelphia** , in the Commonwealth of Pennsylvania.

Identification (e.g., Parcel #; Lot, Block; Deed Book, Page, Recording Date):

Tax ID #(s): **871539470**

---

### BUYER'S RELATIONSHIP WITH PA LICENSED BROKER

☐ **No Business Relationship (Buyer is not represented by a broker)**

| Broker (Company) **MPN Realty Inc** | Licensee(s) (Name) **Alexandra Charen** |
|---|---|
| Company Address **1601 Walnut Street, Philadelphia, PA  19102** | Direct Phone(s) **(267)238-1732**<br>Cell Phone(s)    **(215)584-2672** |
| Company Phone **(215)413-4900** | Fax    **(215)413-0230** |
| Company Fax    **(215)413-0230** | Email **acharen@mpnrealty.com** |

Broker is (check only one):

☒ Buyer Agent (Broker represents Buyer only)

☐ Dual Agent (See Dual and/or Designated Agent box below)

Licensee(s) is (check only one):

☒ Buyer Agent (all company licensees represent Buyer)

☐ Buyer Agent with Designated Agency (only Licensee(s) named above represent Buyer)

☐ Dual Agent (See Dual and/or Designated Agent box below)

☐ Transaction Licensee (Broker and Licensee(s) provide real estate services but do not represent Buyer)

---

### SELLER'S RELATIONSHIP WITH PA LICENSED BROKER

☐ **No Business Relationship (Seller is not represented by a broker)**

| Broker (Company) **Keller Williams Philly** | Licensee(s) (Name) **Chardae Taylor** |
|---|---|
| Company Address **728 Broad Street S3, Philadelphia, PA  19146** | Direct Phone(s)<br>Cell Phone(s)    **(267)496-4967)-** |
| Company Phone **(215)607-6007** | Fax |
| Company Fax | Email **chartaylor@kw.com** |

Broker is (check only one):

☒ Seller Agent (Broker represents Seller only)

☐ Dual Agent (See Dual and/or Designated Agent box below)

Licensee(s) is (check only one):

☒ Seller Agent (all company licensees represent Seller)

☐ Seller Agent with Designated Agency (only Licensee(s) named above represent Seller)

☐ Dual Agent(See Dual and/or Designated Agent box below)

☐ Transaction Licensee (Broker and Licensee(s) provide real estate services but do not represent Seller)

---

### DUAL AND/OR DESIGNATED AGENCY

A Broker is a Dual Agent when a Broker represents both Buyer and Seller in the same transaction. A Licensee is a Dual Agent when a Licensee represents Buyer and Seller in the same transaction. All of Broker's licensees are also Dual Agents UNLESS there are separate Designated Agents for Buyer and Seller. If the same Licensee is designated for Buyer and Seller, the Licensee is a Dual Agent.

**By signing this Agreement, Buyer and Seller each acknowledge having been previously informed of, and consented to, dual agency, if applicable.**

Buyer Initials: _____        ASC Page 1 of 10        Seller Initials: _DE_

COPYRIGHT PENNSYLVANIA ASSOCIATION OF REALTORS® 2023
rev. 9/22; rel. 1/23

MPN Realty, Inc., 1601 Walnut Street, Suite 901 Philadelphia, PA 19103        Phone: 215-413-4900        Fax:        2943 W Master Street
Kelly Markowitz        Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201    www.lwolf.com        NON-MEMBER

Doc ID: d788258c7629cb97da5b8b29cc173c3e224d64b2

1.   **By this Agreement, dated** _____July 7, 2023_____ **, Seller hereby agrees to sell and convey to Buyer, who agrees to purchase, the identified Property.**

2.   **PURCHASE PRICE AND DEPOSITS (3-15)**

    (A)  Purchase Price $ 245,000.00 _____

    ( **Two Hundred Forty-Five Thousand** _____

    _____ U.S. Dollars), to be paid as follows:

        1.  Initial Deposit, within __3__ days (5 if not specified) of Execution Date,

           if not included with this Agreement:                 $ _____**5,000.00**

        2.  Additional Deposit within _____ days of the Execution Date:     $ _____

        3.                                    $ _____

    Remaining balance will be paid at settlement.

    (B)  **All funds paid by Buyer, including deposits, will be paid by check, cashier's check or wired funds. All funds paid by Buyer within 30 DAYS of settlement, including funds paid at settlement, will be by cashier's check or wired funds, but not by personal check.**

    (C)  Deposits, regardless of the form of payment and the person designated as payee, will be paid in U.S. Dollars to Broker for Seller (unless otherwise stated here: _____ ) , who will retain deposits in an escrow account in conformity with all applicable laws and regulations until consummation or termination of this Agreement. Only real estate brokers are required to hold deposits in accordance with the rules and regulations of the State Real Estate Commission. Checks tendered as deposit monies may be held uncashed pending the execution of this Agreement.

3.   **SETTLEMENT AND POSSESSION (1-23)**

    (A)  Settlement Date is **10 days from satisfaction of due diligence** _____ , or before if Buyer and Seller agree.

    (B)  Settlement will occur in the county where the Property is located or in an adjacent county, during normal business hours, unless Buyer and Seller agree otherwise.

    (C)  At time of settlement, the following will be pro-rated on a daily basis between Buyer and Seller, reimbursing when applicable: current taxes; rents; interest on mortgage assumptions; condominium fees and homeowner association fees; water and/or sewer fees, together with any other lienable municipal service fees. All charges will be pro-rated for the period(s) covered. Seller will pay up to and including the date of settlement and Buyer will pay for all days following settlement, unless otherwise stated here: _____

    (D)  For purposes of prorating real estate taxes, the "periods covered" are as follows:

        1.  Municipal tax bills for all counties and municipalities in Pennsylvania are for the period from January 1 to December 31.

        2.  School tax bills for the Philadelphia, Pittsburgh and Scranton School Districts are for the period from January 1 to December 31. School tax bills for all other school districts are for the period from July 1 to June 30.

    (E)  Conveyance from Seller will be by fee simple deed of special warranty unless otherwise stated here: _____

    (F)  Payment of transfer taxes will be divided equally between Buyer and Seller unless otherwise stated here: _____

    (G)  Possession is to be delivered by deed, existing keys and physical possession to a vacant Property free of debris, with all structures broom-clean, at day and time of settlement, unless Seller, before signing this Agreement, has identified in writing that the Property is subject to a lease.

    (H)  If Seller has identified in writing that the Property is subject to a lease or short-term rental agreement, possession is to be delivered by deed, existing keys and assignment of existing leases and short-term rental agreements for the Property, together with security deposits and interest, if any, at day and time of settlement. Seller will not enter into any new leases or short-term rental agreements, nor extend existing leases or short-term rental agreements, for the Property without the written consent of Buyer. Buyer will acknowledge existing lease(s) or short-term rental agreement(s) by initialing the lease(s) or short-term rental agreement(s) at the execution of this Agreement, unless otherwise stated in this Agreement.

      ☐ **Tenant-Occupied Property Addendum (PAR Form TOP) is attached and made part of this Agreement.**

4.   **DATES/TIME IS OF THE ESSENCE (3-15)**

    (A)  Written acceptance of all parties will be on or before: **July 10, 2023**

    (B)  The Settlement Date and all other dates and times identified for the performance of any obligations of this Agreement are of the essence and are binding.

    (C)  The Execution Date of this Agreement is the date when Buyer and Seller have indicated full acceptance of this Agreement by signing and/or initialing it. For purposes of this Agreement, the number of days will be counted from the Execution Date, excluding the day this Agreement was executed and including the last day of the time period. **All changes to this Agreement should be initialed and dated.**

    (D)  The Settlement Date is not extended by any other provision of this Agreement and may only be extended by mutual written agreement of the parties.

    (E)  Certain terms and time periods are pre-printed in this Agreement as a convenience to the Buyer and Seller. All pre-printed terms and time periods are negotiable and may be changed by striking out the pre-printed text and inserting different terms acceptable to all parties, except where restricted by law.

5.   **FIXTURES AND PERSONAL PROPERTY (6-20)**

    (A)  It is possible for certain items of personal property to be so integrated into the Property that they become fixtures and will be regarded as part of the Property and therefore included in a sale. Buyer and Seller are encouraged to be specific when negotiating what items will be included or excluded in this sale.

Buyer Initials: _____         ASC Page 2 of 10         Seller Initials: _____ DE

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201    www.lwolf.com    2943 W Master

Doc ID: d788258c7629cb97da5b8b29cc173c3e224d64b2

(B) INCLUDED in this sale are all existing items permanently installed in the Property, free of liens, including plumbing; heating; HVAC equipment; lighting fixtures (including chandeliers and ceiling fans); and water treatment systems, unless otherwise stated below; any remaining heating, cooking and other fuels stored on the Property at the time of settlement. Also included: _____

_____

_____

_____

(C) The following items are not owned by Seller and may be subject to a lease or other financing agreement: _____

_____

(D) EXCLUDED fixtures and items: _____

_____

## 6.  ZONING (4-14)

Failure of this Agreement to contain the zoning classification (except in cases where the property {and each parcel thereof, if subdividable} is zoned solely or primarily to permit single-family dwellings) will render this Agreement voidable at Buyer's option, and, if voided, any deposits tendered by the Buyer will be returned to the Buyer without any requirement for court action.

**Zoning Classification, as set forth in the local zoning ordinance: CMX-1**

## 7.  BUYER FINANCING (7-22)

(A) Buyer may elect to make this Agreement contingent upon obtaining financing for the purchase of the Property. Regardless of any contingency in this Agreement, if Buyer chooses to obtain financing, the following apply:

1.  **Should Buyer furnish false or incomplete information to Seller, Broker(s), or the lender(s) concerning Buyer's legal or financial status, or fail to cooperate in good faith in processing the financing application, which results in the lender(s) refusing to approve a financing commitment, Buyer will be in default of this Agreement.**

2.  Within _____ days (10 if not specified) from the Execution Date of this Agreement, Buyer will make a completed, written application for the financing terms stated above to a responsible lender(s) of Buyer's choice. **Broker for Buyer, if any, otherwise Broker for Seller, is authorized to communicate with the lender(s) to assist in the financing process.**

3.  Seller will provide access to insurers' representatives and, as may be required by the lender(s), to surveyors, municipal officials, appraisers, and inspectors.

(B) **Financing Contingency**

[X] WAIVED. This sale is NOT contingent on financing, although Buyer may obtain financing and/or the parties may include an appraisal contingency. **Buyer and Seller understand that the waiver of this contingency does not restrict Buyer's right to obtain financing for the Property.**

[ ] ELECTED. This sale is contingent upon Buyer obtaining financing according to the terms outlined below. Upon receipt of a financing commitment, Buyer will promptly deliver a copy of the commitment to Seller, but in any case no later than _____ _____ (Commitment Date).

| First Loan on the Property | Second Loan on the Property |
|---|---|
| Loan Amount $ _____ | Loan Amount $ _____ |
| Minimum Term _____ years | Minimum Term _____ years |
| Type of Loan _____ | Type of Loan _____ |
| Interest rate _____ %; however, **Buyer agrees to accept the interest rate as may be committed by the lender,** not to exceed a maximum interest rate of _____ %. | Interest rate _____ %; however, **Buyer agrees to accept the interest rate as may be committed by the lender,** not to exceed a maximum interest rate of _____ %. |

1.  Unless otherwise agreed to in writing by Buyer and Seller, if a written commitment is not received by Seller by the above date, this Agreement may be terminated by Buyer or Seller, with all deposit monies returned to Buyer according to the terms of Paragraph 24.

2.  Buyer will be responsible for any premiums for mechanics' lien insurance and/or title search, or fee for cancellation of same, if any; AND/OR any premiums for flood insurance and/or fire insurance with extended coverage, insurance binder charges or cancellation fee, if any; AND/OR any appraisal fees and charges paid in advance to lender.

## 8.  CHANGE IN BUYER'S FINANCIAL STATUS (6-20)

If a change in Buyer's financial status affects Buyer's ability to purchase, Buyer will, within _____ days (5 if not specified) of said change notify Seller and lender(s) to whom the Buyer submitted loan application, if any, in writing. A change in financial status includes, but is not limited to, loss or a change in income; Buyer's having incurred a new financial obligation; entry of a judgment against Buyer. **Buyer understands that applying for and/or incurring an additional financial obligation may affect Buyer's ability to purchase.**

## 9.  SELLER REPRESENTATIONS (1-20)

(A) **Status of Water**

Seller represents that the Property is served by:

[X] Public Water [ ] Community Water [ ] On-site Water [ ] None [ ] _____

(B) **Status of Sewer**

1.  Seller represents that the Property is served by:

[X] Public Sewer [ ] Community Sewage Disposal System [ ] Ten-Acre Permit Exemption (see Sewage Notice 2)

[ ] Individual On-lot Sewage Disposal System (see Sewage Notice 1) [ ] Holding Tank (see Sewage Notice 3)

[ ] Individual On-lot Sewage Disposal System in Proximity to Well (see Sewage Notice 1; see Sewage Notice 4, if applicable)

[ ] None (see Sewage Notice 1) [ ] None Available/Permit Limitations in Effect (see Sewage Notice 5)

Buyer Initials: _____                    ASC Page 3 of 10                    Seller Initials: _____

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201    www.lwolf.com                    2943 W Master

Doc ID: d788258c7629cb97da5b8b29cc173c3e224d64b2

129     2.   **Notices Pursuant to the Pennsylvania Sewage Facilities Act**
130          **Notice 1: There is no currently existing community sewage system available for the subject property.** Section 7 of the
131          Pennsylvania Sewage Facilities Act provides that no person shall install, construct, request bid proposals for construction, alter,
132          repair or occupy any building or structure for which an individual sewage system is to be installed, without first obtaining a
133          permit. Buyer is advised by this notice that, before signing this Agreement, Buyer should contact the local agency charged with
134          administering the Act to determine the procedure and requirements for obtaining a permit for an individual sewage system. The
135          local agency charged with administering the Act will be the municipality where the Property is located or that municipality
136          working cooperatively with others.
137          **Notice 2: This Property is serviced by an individual sewage system installed under the ten-acre permit exemption provisions
138          of Section 7 of the Pennsylvania Sewage Facilities Act.** (Section 7 provides that a permit may not be required before installing,
139          constructing, awarding a contract for construction, altering, repairing or connecting to an individual sewage system where a ten-acre
140          parcel or lot is subdivided from a parent tract after January 10, 1987). Buyer is advised that soils and site testing were not conducted
141          and that, should the system malfunction, the owner of the Property or properties serviced by the system at the time of a malfunction
142          may be held liable for any contamination, pollution, public health hazard or nuisance which occurs as a result.
143          **Notice 3: This Property is serviced by a holding tank (permanent or temporary) to which sewage is conveyed by a
144          water carrying system and which is designed and constructed to facilitate ultimate disposal of the sewage at another
145          site.** Pursuant to the Pennsylvania Sewage Facilities Act, Seller must provide a history of the annual cost of maintaining the
146          tank from the date of its installation or December 14, 1995, whichever is later.
147          **Notice 4: An individual sewage system has been installed at an isolation distance from a well that is less than the dis-
148          tance specified by regulation.** The regulations at 25 Pa. Code §73.13 pertaining to minimum horizontal isolation distances
149          provide guidance. Subsection (b) of §73.13 states that the minimum horizontal isolation distance between an individual water
150          supply or water supply system suction line and treatment tanks shall be 50 feet. Subsection (c) of §73.13 states that the hor-
151          izontal isolation distance between the individual water supply or water supply system suction line and the perimeter of the
152          absorption area shall be 100 feet.
153          **Notice 5: This lot is within an area in which permit limitations are in effect and is subject to those limitations.** Sewage facilities
154          are not available for this lot and construction of a structure to be served by sewage facilities may not begin until the municipality com-
155          pletes a major planning requirement pursuant to the Pennsylvania Sewage Facilities Act and regulations promulgated thereunder.
156   (C)   Seller represents and warrants that Seller has no knowledge except as noted in this Agreement that: (1) The premises have been
157          contaminated by any substance in any manner which requires remediation; (2) The Property contains wetlands, flood plains, or any
158          other environmentally sensitive areas, development of which is limited or precluded by law; (3) The Property contains asbestos,
159          polychlorinated biphenyls, lead-based paint or any other substance, the removal or disposal of which is subject to any law or reg-
160          ulation; and (4) Any law has been violated in the handling or disposing of any material or waste or the discharge of any material
161          into the soil, air, surface water, or ground water.
162   (D)   Seller agrees to indemnify and to hold Broker harmless from and against all claims, demands, or liabilities, including attorneys
163          fees and court costs, which arise from or are related to the environmental condition or suitability of the Property prior to, during,
164          or after Seller's occupation of the Property including without limitation any condition listed in Paragraph 9(C).
165   (E)   Seller is not aware of historic preservation restrictions regarding the Property unless otherwise stated here: _____
166          _____
167          _____
168   (F)   Seller represents that, as of the date Seller signed this Agreement, no public improvement, condominium or homeowner asso-
169          ciation assessments have been made against the Property which remain unpaid, and that no notice by any government or public
170          authority has been served upon Seller or anyone on Seller's behalf, including notices relating to violations of zoning, housing,
171          building, safety or fire ordinances that remain uncorrected, and that Seller knows of no condition that would constitute a violation
172          of any such ordinances that remain uncorrected, unless otherwise specified here: _____
173          _____
174   (G)   Seller knows of no other potential notices (including violations) and/or assessments except as follows: _____
175          _____
176   (H)   Access to a public road may require issuance of a highway occupancy permit from the Department of Transportation.
177   (I)   **Internet of Things (IoT) Devices**
178         1.   The presence of smart and green devices that are capable of connecting to the Internet, directly or indirectly, and the data stored
179              on those devices make up a digital ecosystem in the Property sometimes referred to as the "Internet of Things (IoT)." Buyer
180              and Seller acknowledge that IoT devices may transmit data to third parties outside of the control of their owner.
181         2.   On or before settlement, Seller will make a reasonable effort to clear all data stored on all IoT devices located on the Property
182              and included in the sale. Seller further acknowledges that all personal devices owned by Seller (including but not limited to
183              cellular telephones, personal computers and tablets) having connectivity to any IoT device(s) located on the Property will be
184              disconnected and cleared of relevant data prior to settlement. Further, no attempts will be made after settlement by Seller or
185              anyone on Seller's behalf to access any IoT devices remaining on the Property.
186         3.   Following settlement, Buyer will make a reasonable effort to clear all stored data from any IoT device(s) remaining on the
187              Property and to restrict access to said devices by Seller, Seller's agents or any third party to whom Seller may have previously
188              provided access. This includes, but is not limited to, restoring IoT devices to original settings, changing passwords or codes,
189              updating network settings and submitting change of ownership and contact information to device manufacturers and service
190              providers.
191         4.   This paragraph will survive settlement.

192   **Buyer Initials:** _____                     ASC Page 4 of 10                     **Seller Initials:** _____

Doc ID: d788258c7629cb97da5b8b29cc173c3e224d64b2

193   **10. WAIVER OF CONTINGENCIES (9-05)**
194   **If this Agreement is contingent on Buyer's right to inspect and/or repair the Property, or to verify insurability, environmental**
195   **conditions, boundaries, certifications, zoning classification or use, or any other information regarding the Property, Buyer's**
196   **failure to exercise any of Buyer's options within the times set forth in this Agreement is a WAIVER of that contingency and**
197   **Buyer accepts the Property and agrees to the RELEASE in Paragraph 26 of this Agreement.**
198   **11. BUYER'S DUE DILIGENCE (3-15)**
199   ☐   **WAIVED.** This sale is NOT contingent upon the results of any inspection(s), although Buyer may inspect the Property (including
200       fixtures and any personal property specifically listed herein). Buyer agrees to purchase the Property **IN ITS PRESENT**
201       **CONDITION,** regardless of the results of any inspection(s) or findings that Buyer may learn of after the Execution Date of this
202       Agreement.
203   ☒   **ELECTED.** This sale IS contingent upon the results of inspection(s). It is Buyer's responsibility to determine that the condition
204       and permitted use of the property is satisfactory. Buyer may, within _____15_____ days (30 if not specified) from the Execution Date
205       of this Agreement, conduct due diligence (Due Diligence Period), which includes, but is not limited to, verifying that the condi-
206       tion, permitted use, insurability, environmental conditions, boundaries, certifications, deed restrictions, zoning classifications
207       and any other features of the Property are satisfactory. Buyer may request that the property be inspected, at Buyer's expense, by
208       qualified professionals to determine the physical, structural, mechanical and environmental condition of the land, improvements
209       or their components, or for the suitability of the property for Buyer's needs. If, as the result of Buyer's due diligence, Buyer
210       determines that the Property is not suitable for Buyer's needs, Buyer may, prior to the expiration of the Due Diligence Period,
211       terminate this Agreement by written notice to Seller, with all deposit monies returned to Buyer according to the terms of
212       Paragraph 24 of this Agreement. In the event that Buyer has not provided Seller with written notice of Buyer's intent to termi-
213       nate this Agreement prior to the end of the Due Diligence Period, this Agreement shall remain in full force and effect in accor-
214       dance with the terms and conditions as more fully set forth in this Agreement.
215   (A)  **Buyer has been given the opportunity to inspect the Property** (including fixtures and any personal property specifically listed
216       herein) **and, subject to the Due Diligence contingency if elected, agrees to purchase the Property IN ITS PRESENT CON-**
217       **DITION unless the parties agree otherwise in writing. Buyer's decision to purchase the Property is a result of Buyer's own**
218       **inspections and determinations and not because of or in reliance on any representations made by Seller or any other party.**
219       Buyer acknowledges that Brokers, their licensees, employees, officers or partners have not made an independent examination or
220       determination of the structural soundness of the Property, the age or condition of the components, environmental conditions, the
221       permitted uses, nor of conditions existing in the locale where the Property is situated; nor have they made a mechanical inspection
222       of any of the systems contained therein.
223   (B)  Any repairs required by this Agreement will be completed in a workmanlike manner.
224   (C)  Revised flood maps and changes to Federal law may substantially increase future flood insurance premiums or require insurance
225       for formerly exempt properties. Buyer should consult with one or more insurance agents regarding the need for flood insurance
226       and possible premium increases.
227   **12. NOTICES, ASSESSMENTS AND MUNICIPAL REQUIREMENTS (4-14)**
228   (A)  In Pennsylvania, taxing authorities (school districts and municipalities) and property owners may appeal the assessed value of a
229       property at the time of sale, or at any time thereafter. A successful appeal by a taxing authority may result in a higher assessed value
230       for the property and an increase in property taxes. Also, periodic county-wide property reassessments may change the assessed
231       value of the property and result in a change in property tax.
232   (B)  With the exception of county-wide reassessments, assessment appeal notices, notices of change in millage rates or increases in
233       rates, in the event any other notices, including violations, and/or assessments are received after Seller has signed this Agreement
234       and before settlement, Seller will within _____ days (10 if not specified) of receiving the notices and/or assessments provide a
235       copy of the notices and/or assessments to Buyer and will notify Buyer in writing that Seller will:
236   1.  Fully comply with the notices and/or assessments, at Seller's expense, before settlement. If Seller fully complies with the
237       notices and/or assessments, Buyer accepts the Property and agrees to the RELEASE in Paragraph 26 of this Agreement, OR
238   2.  Not comply with the notices and/or assessments. If Seller chooses not to comply with the notices and/or assessments, or **fails**
239       **within the stated time to notify Buyer whether Seller will comply,** Buyer will notify Seller in writing within _____ days
240       (10 if not specified) that Buyer will:
241   a.  Comply with the notices and/or assessments at Buyer's expense, accept the Property, and agree to the RELEASE in
242       Paragraph 26 of this Agreement, OR
243   b.  Terminate this Agreement by written notice to Seller, with all deposit monies returned to Buyer according to the terms of
244       Paragraph 24 of this Agreement.
245       **If Buyer fails to respond** within the time stated in Paragraph 12(B)(2) **or fails to terminate** this Agreement by written notice to
246       Seller within that time, **Buyer will accept the Property** and agree to the RELEASE in Paragraph 26 of this Agreement.
247   (C)  If required by law, ~~within 30 DAYS~~ from the Execution Date of this Agreement, but in no case ~~later than 15~~ DAYS prior to
248       Settlement Date, Seller will order at Seller's expense a certification from the appropriate municipal department(s) disclosing notice
249       of any uncorrected violations of zoning, housing, building, safety or fire ordinances and/or a certificate permitting occupancy of the
250       Property. If Buyer receives a notice of any required repairs/improvements, Buyer will promptly deliver a copy of the notice to Seller.
251   (D)  Seller has no knowledge of any current or pending condemnation or eminent domain proceedings that would affect the Property. If
252       any portion of the Property should be subject to condemnation or eminent domain proceedings after the signing of this Agreement,

253   **Buyer Initials:** _____      **ASC Page 5 of 10**      **Seller Initials:** _____

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201    www.lwolf.com      **2943 W Master**

Doc ID: d788258c7629cb97da5b8b29cc173c3e224d64b2

254    Seller shall immediately advise Buyer, in writing, of such proceedings. Buyer will have the option to terminate this Agreement by
255    written notice to Seller within _____ days (15 days if not specified) after Buyer learns of the filing of such proceedings, with
256    all deposit monies returned to Buyer according to the terms of Paragraph 24 of this Agreement. **Buyer's failure to provide notice**
257    **of termination within the time stated will constitute a WAIVER of this contingency and all other terms of this Agreement**
258    **remain in full force and effect.**

259 **13.  TAX DEFERRED EXCHANGE (4-14)**

260    (A)  If Seller notifies Buyer that it wishes to enter into a tax deferred exchange for the Property pursuant to the Internal Revenue Code,
261        Buyer agrees to cooperate with Seller in connection with such exchange, including the execution of such documents as may be
262        reasonably necessary to conduct the exchange, provided that there shall be no delay in the agreed-to settlement date, and that any
263        additional costs associated with the exchange are paid solely by Seller. Buyer is aware that Seller anticipates assigning Seller's
264        interest in this Agreement to a third party under an Exchange Agreement and consents to such assignment. Buyer shall not be
265        required to execute any note, contract, deed or other document providing any liability which would survive the exchange, nor shall
266        Buyer be obligated to take title to any property other than the Property described in this Agreement. Seller shall indemnify and
267        hold harmless Buyer against any liability which arises or is claimed to have arisen from any aspect of the exchange transaction

268    (B)  If Buyer notifies Seller that it wishes to enter into a tax deferred exchange for the Property pursuant to the Internal Revenue Code,
269        Seller agrees to cooperate with Buyer in connection with such exchange, including the execution of such documents as may be
270        reasonably necessary to conduct the exchange, provided that there shall be no delay in the agreed-to settlement date, and that any
271        additional costs associated with the exchange are paid solely by Buyer. Seller is aware that Buyer has assigned Buyer's interest
272        in this Agreement to a third party under an Exchange Agreement and consents to such assignment. Seller shall not be required
273        to execute any note, contract, deed or other document providing any liability which would survive the exchange. Buyer shall
274        indemnify and hold harmless Seller against any liability which arises or is claimed to have arisen from any aspect of the exchange
275        transaction.

276 **14.  COMMERCIAL CONDOMINIUM (10-01)**

277    [X]  NOT APPLICABLE.

278    [ ]  APPLICABLE. Buyer acknowledges that the condominium unit to be transferred by this Agreement is intended for nonresiden-
279        tial use, and that Buyer may agree to modify or waive the applicability of certain provisions of the Uniform Condominium Act
280        of Pennsylvania (68 Pa.C.S. §3101 *et seq.*).

281 **15.  TITLES, SURVEYS AND COSTS (6-20)**

282    (A)  The Property will be conveyed with good and marketable title that is insurable by a reputable title insurance company at the reg-
283        ular rates, free and clear of all liens, encumbrances, and easements, **excepting however** the following: existing deed restrictions;
284        historic preservation restrictions or ordinances; building restrictions; ordinances; easements of roads; easements visible upon the
285        ground; easements of record; and privileges or rights of public service companies, if any.

286    (B)  Buyer will pay for the following: (1) Title search, title insurance and/or mechanics' lien insurance, or any fee for cancellation;
287        (2) Flood insurance, fire insurance, hazard insurance, mine subsidence insurance, or any fee for cancellation; (3) Appraisal fees
288        and charges paid in advance to mortgage lender; (4) Buyer's customary settlement costs and accruals.

289    (C)  Any survey or surveys required by the title insurance company or the abstracting company for preparing an adequate legal
290        description of the Property (or the correction thereof) will be obtained and paid for by Seller. Any survey or surveys desired by
291        Buyer or required by the mortgage lender will be obtained and paid for by Buyer.

292    (D)  If a change in Seller's financial status affects Seller's ability to convey title to the Property as set forth in this Agreement on or
293        before the Settlement Date, or any extension thereof, Seller shall, within _____ days (5 if not specified) notify Buyer, in writing.
294        A change in financial status includes, but is not limited to, Seller filing bankruptcy; filing of a foreclosure law suit against the
295        Property; entry of a monetary judgment against Seller; notice of public tax sale affecting the Property; and Seller learning that
296        the sale price of the Property is no longer sufficient to satisfy all liens and encumbrances against the Property. In the event of the
297        death of Seller, the representative of the estate, or a surviving Seller shall immediately notify Buyer

298    (E)  If Seller is unable to give good and marketable title that is insurable by a reputable title insurance company at the regular rates, as
299        specified in Paragraph 15(A), Buyer may terminate this Agreement by written notice to Seller, or take such title as Seller can convey.
300        If the title condition precludes Seller from conveying title, Buyer's sole remedy shall be to terminate this Agreement. Upon termina-
301        tion, all deposit monies shall be returned to Buyer according to the terms of Paragraph 24 of this Agreement and Seller will reimburse
302        Buyer for any costs incurred by Buyer for any inspections or certifications obtained according to the terms of this Agreement, and
303        for those items specified in Paragraph 15(B) items (1), (2), (3) and in Paragraph 15(C).

304    (F)  Oil, gas, mineral, or other rights of this Property may have been previously conveyed or leased, and Sellers make no representa-
305        tion about the status of those rights unless indicated elsewhere in this Agreement.
306        [ ] Oil, Gas and Mineral Rights Addendum (PAR Form OGM) is attached and made part of this Agreement.

307    (G)  **COAL NOTICE (Where Applicable)**

308        THIS DOCUMENT MAY NOT SELL, CONVEY, TRANSFER, INCLUDE OR INSURE THE TITLE TO THE COAL AND RIGHTS OF SUPPORT UNDER-
309        NEATH THE SURFACE LAND DESCRIBED OR REFERRED TO HEREIN, AND THE OWNER OR OWNERS OF SUCH COAL MAY HAVE THE
310        COMPLETE LEGAL RIGHT TO REMOVE ALL SUCH COAL AND IN THAT CONNECTION, DAMAGE MAY RESULT TO THE SURFACE OF THE
311        LAND AND ANY HOUSE, BUILDING OR OTHER STRUCTURE ON OR IN SUCH LAND. (This notice is set forth in the manner provided in
312        Section 1 of the Act of July 17, 1957, P.L. 984.) "Buyer acknowledges that he may not be obtaining the right of protection against
313        subsidence resulting from coal mining operations, and that the property described herein may be protected from damage due to
314        mine subsidence by a private contract with the owners of the economic interests in the coal. This acknowledgment is made for
315        the purpose of complying with the provisions of Section 14 of the Bituminous Mine Subsidence and the Land Conservation Act
316        of April 27, 1966." Buyer agrees to sign the deed from Seller which deed will contain the aforesaid provision.

317  **Buyer Initials:** _____        **ASC Page 6 of 10**        **Seller Initials:** _____

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201   www.lwolf.com     2943 W Master

Doc ID: d788258c7629cb97da5b8b29cc173c3e224d64b2

318    (H) The Property is not a "recreational cabin" as defined in the Pennsylvania Construction Code Act unless otherwise stated here: _____

320    (I)    1.    This property is not subject to a Private Transfer Fee Obligation unless otherwise stated here: _____

322    ☐ **Private Transfer Fee Addendum (PAR Form PTF) is attached and made part of this Agreement.**

323    2.    **Notice Regarding Private Transfer Fees:** In Pennsylvania, Private Transfer Fees are defined and regulated in the Private Transfer Fee Obligation Act (Act 1 of 2011; 68 Pa.C.S. §§ 8101, et. seq.), which defines a Private Transfer Fee as "a fee that is payable upon the transfer of an interest in real property, or payable for the right to make or accept the transfer, if the obligation to pay the fee or charge runs with title to the property or otherwise binds subsequent owners of property, regardless of whether the fee or charge is a fixed amount or is determined as a percentage of the value of the property, the purchase price or other consideration given for the transfer." A Private Transfer Fee must be properly recorded to be binding, and sellers must disclose the existence of the fees to prospective buyers. Where a Private Transfer Fee is not properly recorded or disclosed, the Act gives certain rights and protections to buyers.

331 **16. MAINTENANCE AND RISK OF LOSS (10-06)**

332    (A) Seller will maintain the Property, grounds, fixtures and personal property specifically listed in this Agreement in its present condition, normal wear and tear excepted.

334    (B) Seller will promptly notify the Buyer if, at any time prior to the time of settlement, all or any portion of the Property is destroyed, or damaged as a result of any cause whatsoever.

336    (C) Seller bears the risk of loss from fire or other casualties until settlement. If any property included in this sale is destroyed and not replaced, Buyer will:

338      1. Accept the Property in its then current condition together with the proceeds of any insurance recovery obtainable by Seller, OR

339      2. Terminate this Agreement by written notice to Seller, with all deposit monies returned to Buyer according to the terms of Paragraph 24 of this Agreement.

341 **17. RECORDING (9-05)**

342 This Agreement will not be recorded in the Office of the Recorder of Deeds or in any other office or place of public record. If Buyer causes or permits this Agreement to be recorded, Seller may elect to treat such act as a default of this Agreement.

344 **18. ASSIGNMENT (1-10)**

345 This Agreement is binding upon the parties, their heirs, personal representatives, guardians and successors, and to the extent assignable, on the assigns of the parties hereto. Buyer will not transfer or assign this Agreement without the written consent of Seller unless otherwise stated in this Agreement. Assignment of this Agreement may result in additional transfer taxes.

348 **19. GOVERNING LAW, VENUE AND PERSONAL JURISDICTION (9-05)**

349    (A) The validity and construction of this Agreement, and the rights and duties of the parties, will be governed in accordance with the laws of the Commonwealth of Pennsylvania.

351    (B) The parties agree that any dispute, controversy or claim arising under or in connection with this Agreement or its performance by either party submitted to a court shall be filed exclusively by and in the state or federal courts sitting in the Commonwealth of Pennsylvania. Seller understands that any documentation provided under this provision may be disclosed to the Internal Revenue Service by Buyer, and that any false statements contained therein could result in punishment by fine, imprisonment, or both.

355 **20. NOTICE REGARDING CONVICTED SEX OFFENDERS (MEGAN'S LAW) (6-13)**

356 The Pennsylvania General Assembly has passed legislation (often referred to as "Megan's Law," 42 Pa.C.S. § 9791 et seq.) providing for community notification of the presence of certain convicted sex offenders. **Buyers are encouraged to contact the municipal police department or the Pennsylvania State Police** for information relating to the presence of sex offenders near a particular property, or to check the information on the Pennsylvania State Police Web site at www.pamegranslaw.state.pa.us.

360 **21. CERTIFICATION OF NON-FOREIGN INTEREST (10-01)**

361    ☐ Seller **IS** a foreign person, foreign corporation, foreign partnership, foreign trust, or foreign estate subject to Section 1445 of the Internal Revenue Code, which provides that a transferee (Buyer) of a U.S. real property interest must withhold tax if the transferor (Seller) is a foreign person.

364    ☒ Seller is **NOT** a foreign person, foreign corporation, foreign partnership, foreign trust, or a foreign estate as defined by the Internal Revenue Code, or is otherwise not subject to the tax withholding requirements of Section 1445 of the Internal Revenue Code. To inform Buyer that the withholding of tax is not required upon the sale/disposition of the Property by Seller, Seller hereby agrees to furnish Buyer, at or before closing, with the following:

368      ☒ An affidavit stating, under penalty of perjury, the Seller's U.S. taxpayer identification number and that the Seller is not a foreign person.

370      ☐ A "qualifying statement," as defined by statute, that tax withholding is not required by Buyer.

371      ☐ Other: _____

372 **22. REPRESENTATIONS (1-10)**

373    (A) All representations, claims, advertising, promotional activities, brochures or plans of any kind made by Seller, Brokers, their licensees, employees, officers or partners are not a part of this Agreement unless expressly incorporated or stated in this Agreement. This Agreement contains the whole agreement between Seller and Buyer, and there are no other terms, obligations, covenants, representations, statements or conditions, oral or otherwise, of any kind whatsoever concerning this sale. This Agreement will not be altered, amended, changed or modified except in writing executed by the parties.

377    (B) Broker(s) have provided or may provide services to assist unrepresented parties in complying with this Agreement.

379    **Buyer Initials:** _____      **ASC Page 7 of 10**      **Seller Initials:** _DE_

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201   www.lwolf.com    **2943 W Master**

Doc ID: d788258c7629cb97da5b8b29cc173c3e224d64b2

**23. BROKER INDEMNIFICATION (6-13)**

(A) Buyer and Seller represent that the only Brokers involved in this transaction are:  **Keller Williams Philly and MPN Realty Inc.**

and that the transaction has not been brought about through the efforts of anyone other than said Brokers. It is agreed that if any claims for brokerage commissions or fees are ever made against Buyer or Seller in connection with this transaction, each party shall pay its own legal fees and costs in connection with such claims. It is further agreed that Buyer and Seller agree to indemnify and hold harmless each other and the above-listed Brokers from and against the non-performance of this Agreement by either party, and from any claim of loss or claim for brokerage commissions, including all legal fees and costs, that may be made by any person or entity. This paragraph shall survive settlement.

(B) Seller and Buyer acknowledge that any Broker identified in this Agreement: (1) Is a licensed real estate broker; (2) Is not an expert in construction, engineering, code or regulatory compliance or environmental matters and was not engaged to provide advice or guidance in such matters, unless otherwise stated in writing; and (3) Has not made and will not make any representations or warranties nor conduct investigations of the environmental condition or suitability of the Property or any adjacent property, including but not limited to those conditions listed in Paragraph 9(C).

**24. DEFAULT, TERMINATION AND RETURN OF DEPOSITS (1-18)**

(A) Where Buyer terminates this Agreement pursuant to any right granted by this Agreement, Buyer will be entitled to a return of all deposit monies paid on account of Purchase Price pursuant to the terms of Paragraph 24(B), and this Agreement will be VOID. Termination of this Agreement may occur for other reasons giving rise to claims by Buyer and/or Seller for the deposit monies.

(B) Regardless of the apparent entitlement to deposit monies, Pennsylvania law does not allow a Broker holding deposit monies to determine who is entitled to the deposit monies when settlement does not occur. Broker can only release the deposit monies:

 1. If this Agreement is terminated prior to settlement and there is no dispute over entitlement to the deposit monies. A written agreement signed by both parties is evidence that there is no dispute regarding deposit monies.
 2. If, after Broker has received deposit monies, Broker receives a written agreement that is signed by Buyer and Seller, directing Broker how to distribute some or all of the deposit monies.
 3. According to the terms of a final order of court.
 4. According to the terms of a prior written agreement between Buyer and Seller that directs the Broker how to distribute the deposit monies if there is a dispute between the parties that is not resolved. (See Paragraph 24 (C))

(C) Buyer and Seller agree that if there is a dispute over the entitlement to deposit monies that is unresolved _____ days (180 if not specified) days after the Settlement Date stated in Paragraph 3(A) (or any written extensions thereof) or following date of termination of the Agreement, whichever is earlier, then the Broker holding the deposit monies will, within 30 days of receipt of Buyer's written request, distribute the deposit monies to Buyer unless the Broker is in receipt of verifiable written notice that the dispute is the subject of litigation or mediation. If Broker has received verifiable written notice of litigation or mediation prior to the receipt of Buyer's request for distribution, Broker will continue to hold the deposit monies until receipt of a written distribution agreement between Buyer and Seller or a final court order. Buyer and Seller are advised to initiate litigation or mediation for any portion of the deposit monies prior to any distribution made by Broker pursuant to this paragraph. Buyer and Seller agree that the distribution of deposit monies based upon the passage of time does not legally determine entitlement to deposit monies, and that the parties maintain their legal rights to pursue litigation even after a distribution is made.

(D) Buyer and Seller agree that Broker who holds or distributes deposit monies pursuant to the terms of Paragraph 24 or Pennsylvania law will not be liable. Buyer and Seller agree that if any Broker or affiliated licensee is named in litigation regarding deposit monies, the attorneys' fees and costs of the Broker(s) and licensee(s) will be paid by the party naming them in litigation.

(E) Seller has the option of retaining all sums paid by Buyer, including deposit monies, should Buyer:

 1. Fail to make any additional payments as specified in Paragraph 2, OR
 2. Furnishes false or incomplete information to Seller, Broker(s), or any other party identified in this Agreement concerning Buyer's legal or financial status, OR
 3. Violate or fails to fulfill and perform any other terms or conditions of this Agreement.

(F) **Unless otherwise checked in Paragraph 24(G)**, Seller may elect to retain those sums paid by Buyer, including deposit monies:

 1. On account of purchase price, OR
 2. As monies to be applied to Seller's damages, OR
 3. As liquidated damages for such default.

(G) [X] **SELLER IS LIMITED TO RETAINING SUMS PAID BY BUYER, INCLUDING DEPOSIT MONIES, AS LIQUIDATED DAMAGES**

(H) If Seller receives all sums paid and/or owed by Buyer, including deposit monies, as liquidated damages pursuant to Paragraph 24(F) or (G), Buyer and Seller are released from further liability or obligation and this Agreement is VOID.

(I) Brokers and licensees are not responsible for unpaid deposits.

**25. ARBITRATION OF DISPUTES (1-00)**

Buyer and Seller agree to arbitrate any dispute between them that cannot be amicably resolved. After written demand for arbitration by either Buyer or Seller, each party will select a competent and disinterested arbitrator. The two so selected will select a third. If selection of the third arbitrator cannot be agreed upon within 30 days, either party may request that selection be made by a judge of a court of record in the county in which arbitration is pending. Each party will pay its chosen arbitrator, and bear equally expenses for the third and all other expenses of arbitration. Arbitration will be conducted in accordance with the provisions of Pennsylvania Common Law Arbitration 42 Pa. C.S.A. §7341 *et seq.* This agreement to arbitrate disputes arising from this Agreement will survive settlement.

Buyer Initials: _____    **ASC Page 8 of 10**    Seller Initials: ____ [DS] DE

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201    www.lwolf.com    2943 W Master

Doc ID: d788258c7629cb97da5b8b29cc173c3e224d64b2

442 **26. RELEASE (9-05)**
443     **Buyer releases, quit claims and forever discharges SELLER, ALL BROKERS, their LICENSEES, EMPLOYEES and any**
444     **OFFICER or PARTNER of any one of them and any other PERSON, FIRM or CORPORATION who may be liable by or**
445     **through them, from any and all claims, losses or demands,** including, but not limited to, personal injury and property damage and all
446     of the consequences thereof, whether known or not, which may arise from the presence of termites or other wood-boring insects, radon,
447     lead-based paint hazards, mold, fungi or indoor air quality, environmental hazards, any defects in the individual on-lot sewage disposal
448     system or deficiencies in the on-site water service system, or any defects or conditions on the Property. Should Seller be in default under
449     the terms of this Agreement or in violation of any Seller disclosure law or regulation, this release does not deprive Buyer of any right to
450     pursue any remedies that may be available under law or equity. This release will survive settlement.

451 **27. REAL ESTATE RECOVERY FUND (1-18)**
452     A Real Estate Recovery Fund exists to reimburse any persons who have obtained a final civil judgment against a Pennsylvania real
453     estate licensee (or a licensee's affiliates) owing to fraud, misrepresentation, or deceit in a real estate transaction and who have been
454     unable to collect the judgment after exhausting all legal and equitable remedies. For complete details about the Fund, call (717) 783-
455     3658.

456 **28. COMMUNICATIONS WITH BUYER AND/OR SELLER (6-13)**
457     Wherever this Agreement contains a provision that requires or allows communication/delivery to a Buyer, that provision shall be
458     satisfied by communication/delivery to the Broker for Buyer, if any, except where required by law. If there is no Broker for Buyer,
459     those provisions may be satisfied only by communication/delivery being made directly to the Buyer, unless otherwise agreed to by the
460     parties. Wherever this Agreement contains a provision that requires or allows communication/delivery to a Seller, that provision shall
461     be satisfied by communication/delivery to the Broker for Seller, if any. If there is no Broker for Seller, those provisions may be satisfied
462     only by communication/delivery being made directly to the Seller, unless otherwise agreed to by the parties.

463 **29. NOTICE BEFORE SIGNING (4-14)**
464     Unless otherwise stated in writing, Buyer and Seller acknowledge that Brokers are not experts in legal or tax matters and that Brokers
465     have not made, nor will they make, any representations or warranties nor conduct research of the legal or tax ramifications of this
466     Agreement. Buyer and Seller acknowledge that Brokers have advised them to consult and retain experts concerning the legal and tax
467     effects of this Agreement and the completion of the sale, as well as the condition and/or legality of the Property, including, but not
468     limited to, the Property's improvements, equipment, soil, tenancies, title and environmental aspects. Buyer and Seller acknowledge
469     receipt of a copy of this Agreement at the time of signing. **This Agreement may be executed in one or more counterparts,** each of
470     which shall be deemed to be an original and which counterparts together shall constitute one and the same Agreement of the Parties.
471     **WHEN SIGNED, THIS AGREEMENT IS A BINDING CONTRACT.** Return of this Agreement, and any addenda and amend-
472     ments ,including **return by electronic transmission,** bearing the signatures of all parties, constitutes acceptance by the parties.

473 **30. SPECIAL CLAUSES (4-14)**
474     (A) **The following are part of this Agreement if checked:**
475         ☐ Appraisal Contingency Addendum to Agreement of Sale (PAR Form ACA)
476         ☐ Short Sale Addendum to Agreement of Sale (PAR Form SHS)
477         ☐ Zoning Change Addendum to Agreement of Sale (PAR Form ZCA)
478         ☐ _____
479         ☐ _____
480         ☐ _____

481     (B) **Additional Terms:**
482         **- Seller will remedy water leak in basement and provide proof thereof no later than 48 hours prior to closing.**
483         **- All furnishings in the dwelling to be removed by Seller prior to closing.**
484         **- Buyer shall be entitled to reasonable access to the property (no less than six (6) visits) after the close of the Inspection Period**
485         **and before Settlement, with reasonable notice to Seller. Seller is unaware of any proposed tax reassessments and has not closed**
486         **a permit regarding the Property in the last six (6) months. Seller represents and warrants that there are no open permits**
487         **pertaining to the property. The prevailing party in litigation brought to enforce this Agreement is entitled to reasonable**
488         **attorney's fees and costs.**
489         **- Line 247 is amended to provide for the following timeframes: 3 days, but in no case later than 10 days prior to settlement.**

490
491
492
493
494
495
496
497
498
499
500
501
502
503
504
505

506     Buyer Initials: _____          ASC Page 9 of 10          Seller Initials: _DE_

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201    www.lwolf.com    2943 W Master

Doc ID: d788258c7629cb97da5b8b29cc173c3e224d64b2

507 _____ Buyer has received the Consumer Notice, where applicable, as adopted by the State Real Estate Commission at 49 Pa.
508 Code §35.336.

509 _____ Buyer has received a statement of Buyer's estimated closing costs before signing this Agreement.

510 _____ Buyer has received the Deposit Money Notice (for cooperative sales when Broker for Seller is holding deposit money)
511 before signing this Agreement.

512 **BUYER** _____   **DATE** ___07 / 08 / 2023___

513 Mailing  Address  **1220 Morris Street, Philadelphia, PA  19148**
514 Phone(s) **(917)751-7044**_____ Fax _____ Email  **bonnie@vanilyabakery.com**
515 **BUYER** _____   **DATE** _____

516 Mailing    Address  _____
517 Phone(s) _____ Fax _____ Email _____
518 **BUYER** _____   **DATE** _____

519 Mailing  Address  _____
520 Phone(s) _____ Fax _____ Email _____
521 **AUTHORIZED  REPRESENTATIVE  Bonnie Sarana**
522 Title  **owner**
523 **COMPANY** _____

524 Seller has received the Consumer Notice, where applicable, as adopted by the State Real Estate Commission at 49 Pa. Code § 35.336.
525 Seller has received a statement of Seller's estimated closing costs before signing this Agreement.

526 **VOLUNTARY  TRANSFER  OF  CORPORATE  ASSETS** (if applicable): The undersigned acknowledges that he/she is authorized
527 by the Board of Directors to sign this Agreement on behalf of the Seller corporation and that this sale does not constitute a sale, lease, or
528 exchange of all or substantially all the property and assets of the corporation, such as would require the authorization or consent of the
529 shareholders pursuant to 15 P.S. §1311.

530 **SELLER** _*Diamante Enterprises*_____   **DATE** ___7/13/2023  |  6:50 AM PDT___
531 Mailing  Address  **P.O. Box 268104, Weston, FL  33326**
532 Phone(s) _____ Fax _____ Email _____
533 **SELLER** _____   **DATE** _____

534 Mailing  Address  _____
535 Phone(s) _____ Fax _____ Email _____
536 **SELLER** _____   **DATE** _____

537 Mailing  Address  _____
538 Phone(s) _____ Fax _____ Email _____
539 **AUTHORIZED  REPRESENTATIVE  Danielle Parker**
540 Title  **owner**
541 **COMPANY** _____

**ASC Page 10 of 10**

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX  75201   www.lwolf.com          **2943 W Master**

Doc ID: d788258c7629cb97da5b8b29cc173c3e224d64b2

DocuSign Envelope ID: F2A2A574-0913-4B29-A329-3FDED387ED90

 **Dropbox** Sign

Audit trail

| | |
|---|---|
| **Title** | updated AOS 2943 W Master for signing |
| **File name** | AOS 2943 W Master St 7.7.23 Final.pdf |
| **Document ID** | d788258c7629cb97da5b8b29cc173c3e224d64b2 |
| **Audit trail date format** | MM / DD / YYYY |
| **Status** | ● Signed |

## Document History

| | | |
|---|---|---|
| **SENT** | **07 / 07 / 2023** 18:52:01 UTC | Sent for signature to Bonnie Sarana (bonnie@vanilyabakery.com) from acharen@mpnrealty.com IP: 71.225.68.238 |
| **VIEWED** | **07 / 07 / 2023** 23:18:22 UTC | Viewed by Bonnie Sarana (bonnie@vanilyabakery.com) IP: 96.227.239.163 |
| **SIGNED** | **07 / 08 / 2023** 13:31:33 UTC | Signed by Bonnie Sarana (bonnie@vanilyabakery.com) IP: 107.115.17.6 |
| **COMPLETED** | **07 / 08 / 2023** 13:31:33 UTC | The document has been completed. |

# EXHIBIT "C"

DocuSign Envelope ID: CEA7470E-8BD3-490F-9EE6-07B856D9EC37

**CHANGE IN TERMS ADDENDUM TO AGREEMENT OF SALE**                    **CTA**

This form recommended and approved for, but not restricted to use by, the members of the Pennsylvania Association of Realtors® (PAR).

| | |
|---|---|
| 1 | PROPERTY <u>2943 W Master Street, Philadelphia, PA  19121</u> |
| 2 | SELLER <u>Diamante Enterprises - Danielle Parker</u> |
| 3 | BUYER <u>BSAJ LLC</u> |

4  **The following terms of the Agreement of Sale are changed as stated below:**
5  **1.  REPAIRS**
6      Seller, at Seller's expense, will complete the following repairs no later than _____ days prior to Settlement Date (prior to
7      settlement, if not specified), in a workmanlike manner, with all required permits, according to the attached contractor's proposal(s),
8      if any, the terms of which, including the persons and specifications contained therein, shall become part of this Agreement:
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

24  **2.  SELLER ASSIST**
25      Seller Assist is changed to $ <u>__3,500.00__</u> , or _____ % of the Purchase price, maximum, toward Buyer's costs as per-
26      mitted by the mortgage lender, if any. Seller is only obligated to pay up to the amount or percentage which is approved by mortgage
27      lender.

28  **3.  PURCHASE PRICE**
29      Purchase price is changed from $ _____ to $ _____ .

30  **4.  ACCEPTANCE & SETTLEMENT**
31      (A) Written acceptance of all parties will be on or before: _____
32      (B) Settlement Date is changed from _____ to _____

33  **5.  MORTGAGE TERMS**
34      (A) **Mortgage Type** is changed from _____ to _____
35      (B) **Mortgage amount**
36          1.   First mortgage amount is changed from $ _____ to $ _____
37          2.   Second mortgage amount is changed from $ _____ to $ _____
38      (C) **Mortgage Lender**
39          1.   First mortgage lender is changed to _____
40          2.   Second mortgage lender is changed to _____
41          3.   Buyer will submit a completed, written mortgage application to the identified lender(s), if any, according to the terms of the
42               Mortgage Contingency paragraph of the Agreement of Sale on or before: _____
43      (D) **Loan-To-Value (LTV) ratio** (For conventional loans)
44          First mortgage LTV ratio not to exceed _____ %      Second mortgage LTV ratio not to exceed _____ %
45      (E) **Date for Buyer to deliver documentation** of lender's approval of Buyer's mortgage, whether conditional or outright, is
46          changed from _____ to _____

47  Buyer Initials: _____          CTA Page 1 of 2          Seller Initials: *DEDP*

**COPYRIGHT PENNSYLVANIA ASSOCIATION OF REALTORS® 2020**
rev. 3/20; rel. 3/20

MPN Realty, Inc., 1601 Walnut Street, Suite 901 Philadelphia, PA 19103                    Phone: 215-413-4900        Fax:                    2943 W Master
Kelly Markowitz                    Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX  75201   www.lwolf.com              NON-MEMBER

DocuSign Envelope ID: CEA7470E-8BD3-490F-9EE6-07B856D9EC37

48  **6.  TIME PERIODS**

49  (A) The time period in paragraph _____, line _____ of Agreement of Sale is changed to _____.

50  The time period in paragraph _____, line _____ of Agreement of Sale is changed to _____.

51  The time period in paragraph _____, line _____ of Agreement of Sale is changed to _____.

52  The time period in paragraph _____, line _____ of Agreement of Sale is changed to _____.

53  The time period in paragraph _____, line _____ of Agreement of Sale is changed to _____.

54  (B) The time period in paragraph _____, line _____ of the _____ Addendum is changed to _____.

55  The time period in paragraph _____, line _____ of the _____ Addendum is changed to _____.

56  The time period in paragraph _____, line _____ of the _____ Addendum is changed to _____.

57  The time period in paragraph _____, line _____ of the _____ Addendum is changed to _____.

58  The time period in paragraph _____, line _____ of the _____ Addendum is changed to _____.

59  **7.  OTHER**

60  - $1,000 to be held in escrow for 60 days after closing for any future water bills that may come in after closing that were

61  affected by water meter leaking

62  - Settlement to occur on the later of 10 days after the satisfaction of due diligence or 5 days following approval from the

63  bankruptcy court.  In the event the bankruptcy court has not provided approval to proceed within 45 days of the date

64  of this agreement, Buyer may terminate and all deposit funds shall be returned to Buyer.

65  - Due Diligence ends 8/1/23 per original AOS.

66

67

68  All other terms and conditions of the Agreement, including all other time periods, remain unchanged and in full force and effect.

69  **BUYER** _____ **BSAJ LLC**  **DATE** _____

70  **BUYER** _____  **DATE** _____

71  **BUYER** _____  **DATE** _____

72  **SELLER** *Diamanté Enterprises- Danielle Parker* Diamanté Enterprises - Danielle Parker  **DATE** 7/27/2023 | 7:58 AM PDT

        FC36CFA63AE34A2...

73  **SELLER** _____  **DATE** _____

74  **SELLER** _____  **DATE** _____

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201  www.lwolf.com    2943 W Master

# EXHIBIT "D"

Account Number:    Diamante Enterprises
Borrower's Name:    Danielle Morris
Property Collateralized A 2943 West Master Street , Philadelphia, check

| Account Number:Diamante Enterprises — Property Collateralized Address: 2943 West Master Street , Philadelphia, PA 19130 | Payoff 10/31/2022 per Forbearance Agreement | 10/31/2022 forbearance Fee per Agreement | 10/31/2022 payment | 10/31/22 - Balance due after pmt | Charges | 11/15/2022 Payment | 11/15/2022 Payment #2 | 11/30/22 - Balance due after pmt | charges | 12/15/2022 pmt | 12/31/22 - Balance due after pmt* | charges | payment 1/4/2023 | 1/31/2023 | Charges 2/2023 | payment 2/6/2023 | 3/1/2023 | Charges 3/1 - 6/13/2023 | Payoff 6/13/2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Principal Balance | $131,099.40 | | $0.00 | $131,099.40 | | | | $131,099.40 | | | $131,099.40 | | -$12,452.23 | $118,647.17 | | -$7,520.89 | $111,126.28 | | $111,126.28 |
| Modification Fee | $19,397.84 | | $0.00 | $19,397.84 | | -$19,397.84 | | $0.00 | | $0.00 | $0.00 | | | $0.00 | | | $0.00 | | $0.00 |
| Legal & Misc Costs | $41,969.83 | | -$41,969.83 | $0.00 | | | | $0.00 | | | $0.00 | | | $0.00 | | | $0.00 | | $0.00 |
| Forbearance Fee | $10,000.00 | $10,000.00 | -$2,321.21 | $17,678.79 | | -$2,186.59 | -$2,000.00 | $13,492.20 | | -$2,000.00 | $11,492.20 | | -$11,492.20 | $0.00 | | | $0.00 | | $0.00 |
| Interest Due | $28,290.57 | | $0.00 | $28,290.57 | | -$28,290.57 | | $0.00 | | $0.00 | $0.00 | $15,305.57 | -$15,305.57 | $0.00 | $2,229.11 | -$2,229.11 | $0.00 | $8,589.73 | $8,589.73 |
| Service Fee | $250.00 | | -$250.00 | $0.00 | | | | $0.00 | | $0.00 | $0.00 | | | $0.00 | | | $0.00 | $500.00 | $500.00 |
| Late Fees | $2,818.96 | | -$2,818.96 | $0.00 | $125.00 | -$125.00 | | $0.00 | $125.00 | $0.00 | $125.00 | $125.00 | -$250.00 | $0.00 | $250.00 | -$250.00 | $0.00 | | $0.00 |
| Bank Fees | $640.00 | | -$640.00 | $0.00 | | | | $0.00 | | | $0.00 | | | $0.00 | | | $0.00 | | $0.00 |
| Payoff Fee | $2,000.00 | | -$2,000.00 | $0.00 | | | | $0.00 | | | $0.00 | $500.00 | -$500.00 | $0.00 | | | $0.00 | $500.00 | $500.00 |
| Less Escrow Refunded | -$8,566.19 | | | -$8,566.19 | | | | -$8,566.19 | | | -$8,566.19 | | | -$8,566.19 | | | -$8,566.19 | | -$8,566.19 |
| Payment | $227,900.41 | $10,000.00 | -$50,000.00 | $187,900.41 | $125.00 | -$50,000.00 | -$2,000.00 | $136,025.41 | $125.00 | -$2,000.00 | $134,150.41 | $15,930.57 | -$60,000.00 | $110,080.98 | $2,479.11 | -$10,000.00 | $102,560.09 | $9,589.73 | $112,149.82 |

# EXHIBIT "E"



## FIDELITY NATIONAL TITLE INSURANCE COMPANY

## SCHEDULE B, PART I
(continued)

PRIOR TO CLOSING YOU MUST ASCERTAIN AMOUNTS DUE BY CHECKING THE CITY'S WEBSITE AT: https://www.phila.gov/revenue/realestatetax/.  NOTE: PLEASE BE MINDFUL OF ANY STATUS CODES IN STATUS COLUMN.

21.    CURRENT WATER AND SEWER RENTS:
       Account Number: ███████

       The City of Philadelphia now requires the use of a Water Access Code (located on water bills) to obtain account balance information. Water Access Code to be provided sufficiently in advance of closing in order to obtain account balance information.
       Possible excess water and sewer rents from the date of the last reading; billings since that time have been based on estimates.

22.    MECHANICS AND MUNICIPAL CLAIMS:

       MASTER ST              2943               2304W22008239        3898.49
       05-APR-23   871539470 CLAIM FOR WATER
       MASTER ST              2943               2304W22011563        481.45
       05-APR-23   871539470 CLAIM FOR WATER

23.    MORTGAGES:

       a.     Amount: $133,250.00 (Open-End Mortgage)
              Mortgagor: Diamante Enterprises, LLC
              Mortgagee: Gelt Financial, LLC
              Dated: 02/06/2018 and Recorded 02/14/2018 as Document No. 53328441.

              Assignment of Rents, Leases and Agreements of Sale recorded on 02/14/2018 in Document No. 53328442.

              Note: The above mortgage appears to be an OPEN END MORTGAGE securing future advances. If this mortgage is to be paid in full/satisfied and removed from the policy to be issued on this matter, the equity loan account is to be closed or frozen before the payoff is issued.

24.    JUDGMENTS:  EIGHT ATTACHED HERETO.

25.    U.S. Bankruptcy Court, Eastern District of Pennsylvania - No Open Cases Found

26.    Proof that no parties to this transaction are involved in bankruptcy proceedings; if bankruptcy has been

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by Fidelity National Title Insurance Company.  This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I—Requirements; and Schedule B, Part II—Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association.  All rights reserved.**
The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use.  All other uses are prohibited.  Reprinted under license from the American Land Title Association.



AMERICAN
LAND TITLE
ASSOCIATION

ALTA Commitment for Title Insurance (08-01-16)
Schedule B, Part I

2023-0151FN



Commitment for Title Insurance
Adopted 08-01-2016

# FIDELITY NATIONAL TITLE INSURANCE COMPANY

## SCHEDULE B, PART I
(continued)

PRIOR TO CLOSING YOU MUST ASCERTAIN AMOUNTS DUE BY CHECKING THE CITY'S WEBSITE AT: https://www.phila.gov/revenue/realestatetax/.  NOTE: PLEASE BE MINDFUL OF ANY STATUS CODES IN STATUS COLUMN.

21.    CURRENT WATER AND SEWER RENTS:
Account Number: ███████████

The City of Philadelphia now requires the use of a Water Access Code (located on water bills) to obtain account balance information. Water Access Code to be provided sufficiently in advance of closing in order to obtain account balance information.
Possible excess water and sewer rents from the date of the last reading; billings since that time have been based on estimates.

22.    MECHANICS AND MUNICIPAL CLAIMS:

| | | | |
|---|---|---|---|
| MASTER ST | 2943 | 2304W22008239 | 3898.49 |
| 05-APR-23   871539470 CLAIM FOR WATER | | | |
| MASTER ST | 2943 | 2304W22011563 | 481.45 |
| 05-APR-23   871539470 CLAIM FOR WATER | | | |

23.    MORTGAGES:

a.    Amount: $133,250.00 (Open-End Mortgage)
Mortgagor: Diamante Enterprises, LLC
Mortgagee: Gelt Financial, LLC
Dated: 02/06/2018 and Recorded 02/14/2018 as Document No. 53328441.

Assignment of Rents, Leases and Agreements of Sale recorded on 02/14/2018 in Document No. 53328442.

Note: The above mortgage appears to be an OPEN END MORTGAGE securing future advances. If this mortgage is to be paid in full/satisfied and removed from the policy to be issued on this matter, the equity loan account is to be closed or frozen before the payoff is issued.

24.    JUDGMENTS:  EIGHT ATTACHED HERETO.

25.    U.S. Bankruptcy Court, Eastern District of Pennsylvania - No Open Cases Found

26.    Proof that no parties to this transaction are involved in bankruptcy proceedings; if bankruptcy has been

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by Fidelity National Title Insurance Company.  This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I—Requirements; and Schedule B, Part II—Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association.  All rights reserved.**
The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use.  All other uses are prohibited.  Reprinted under license from the American Land Title Association.



AMERICAN
LAND TITLE
ASSOCIATION

# EXHIBIT "F"

ANDREW J. MARLEY, ESQUIRE (312314)
KENYA BATES, ESQUIRE (203664)
STEVEN P. KELLY, ESQUIRE (308573)
JESSICA N. MANIS, ESQUIRE (318705)
MATTHEW C. FALLINGS, ESQUIRE (326896)
MATTHEW FLECK, ESQUIRE (330498)
DANIEL P. JONES, ESQUIRE (321876)
STERN & EISENBERG, PC
1581 MAIN STREET, SUITE 200
THE SHOPS AT VALLEY SQUARE
WARRINGTON, PA 18976
TELEPHONE: (215) 572-8111
FACSIMILE: (215) 572-5025
(COUNSEL FOR PLAINTIFF)



*Filed and Attested by the
Office of Judicial Records
27 FEB 2023 12:12 pm
I. LOWELL*

## IN THE COURT OF COMMON PLEAS OF PENNSYLVANIA
## FOR PHILADELPHIA COUNTY

U.S. Bank National Association, as Indenture
Trust for VCC 2020-MC1 Trust
      Plaintiff
v.
Diamante Enterprises Limited Liability Company
and
Diamante Estates LLC
and
 Twenty Eight Thirty LLC
      Defendants

Civil Action No.: 210901880

MORTGAGE FORECLOSURE

### PRAECIPE FOR ENTRY OF JUDGMENT AND ASSESSMENT OF DAMAGES

TO THE PROTHONOTARY:

Enter judgment in favor of Plaintiff and against Defendants, Diamante Enterprises Limited Liability Company and Diamante Estates LLC and Twenty Eight Thirty LLC, for failure of said Defendants to file a responsive pleading to the Complaint within twenty (20) days of service thereof.

PRINCIPAL BALANCE:................................................................................$316,750.00

INTEREST THROUGH August 31, 2021 AT THE CURRENT RATE OF 11.5000%.......$51,603.84
(CURRENTLY A PER DIEM OF $151.78)

LATE FEES: ..............................................................................................$758.90

ESCROW ADVANCES:................................................................................$2,608.93

CORPORATE ADVANCES: ..........................................................................$3,301.40

FEES BILLED OF:......................................................................................$21,116.64

**SUB-TOTAL THROUGH COMPLAINT** .......................................................**$396,139.71**

ACCRUED INTEREST after August 31, 2021, shall accrue at the per diem rate of
$151.78, to February 8, 2023 ....................................................................$79,836.28

Case ID: 210901880

ATTORNEYS' FEES AND COSTS ................................................................. $8,616.49

**TOTAL THROUGH DATE OF REQUEST FOR JUDGMENT** ................................. **$484,592.48**

STERN & EISENBERG, PC

By: _____

Matthew C. Fallings, Esq.
Attorney for Plaintiff

Case ID: 210901880

# EXHIBIT "G"

eRecorded in Philadelphia PA   Doc Id: 53645815
03/16/2020 09:02 AM     Page 1 of 22     Rec Fee: $226.75
Receipt#: 20-29169
Records Department   Doc Code: M

**Prepared By:** Christy Mclean

**Return To:** Velocity Commercial
Capital, LLC
PO Box 7089
Westlake Village, CA 91359-7089

**Premises:** 3020 Redner Street,
Philadelphia, PA 19121-3510 and 2830
Cecil B. Moore Avenue, Philadelphia,
PA 19121-2736

I2ZZI8

# Open-End Mortgage

# Commercial Mortgage, Security Agreement and Assignment of Leases and Rents

**THIS INSTRUMENT SECURES FUTURE ADVANCES UP TO A MAXIMUM PRINCIPAL AMOUNT OF $316,750.00 PLUS ACCRUED INTEREST AND OTHER INDEBTEDNESS AS DESCRIBED IN PENNSYLVANIA ACT NO. 42 *PA. C.S.A.* SECTION 8143**

This OPEN-END COMMERCIAL MORTGAGE, SECURITY AGREEMENT AND ASSIGNMENT OF LEASES AND RENTS (this *"Mortgage"*) is entered into as of February 28, 2020, between Diamante Enterprises Limited Liability Company, a Pennsylvania limited liability company, with an address of 1401 N 29th St. Suite 200, Philadelphia, Pennsylvania 19121 (the *"Mortgagor"*) and Velocity Commercial Capital, LLC, a California Limited Liability Company, with an address of 30699 Russell Ranch Road, Suite 295, Westlake Village, California 91362 (the *"Lender"*).

The real property which is the subject matter of this Mortgage has the following address(es): 3020 Redner Street, Philadelphia, Pennsylvania 19121-3510 and 2830 Cecil B. Moore Avenue, Philadelphia, Pennsylvania 19121-2736 (the *"Address(es)"*).

# 1. Mortgage, Obligations and Future Advances

**1.1 Mortgage.** For valuable consideration paid and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Mortgagor hereby irrevocably and unconditionally mortgages, grants, bargains, transfers, sells, conveys, sets over and assigns to Lender and its successors and assigns forever, all of Mortgagor's right, title and interest in and to the Property described below, to secure the prompt payment and performance of the Obligations (as hereinafter defined), including without limitation, all amounts due and owing to Lender and all obligations respecting that certain Time Note, dated February 28, 2020, by Diamante Enterprises Limited Liability Company in favor of Lender in the original principal amount of $316,750.00 (the *"Note"*; and collectively, along with all other agreements, documents, certificates and instruments delivered in connection therewith, the *"Loan Documents"*), and any substitutions, modifications, extensions or amendments to any of the Loan Documents.

**1.2 Security Interest in Property.** As continuing security for the Obligations the Mortgagor hereby pledges, assigns and grants to the Lender, and its successors and assigns, a security interest in any of the Property (as hereinafter defined) constituting personal property or fixtures. This Mortgage is and shall be deemed to be a security agreement and financing statement pursuant to the terms of the *Uniform Commercial Code of Pennsylvania* (the *"Uniform Commercial Code"*) as to any and all personal property and fixtures and as to all such property the Lender shall have the rights and remedies of a secured party under the Uniform Commercial Code in addition to its rights hereunder. This Mortgage constitutes a financing statement filed as a fixture filing under Section 9-502(c) of the Uniform Commercial Code covering any Property which now is or later may become a fixture.

**1.3 Collateral Assignment of Leases and Rents.** The Mortgagor hereby irrevocably and unconditionally assigns to Lender, and its successors and assigns, as collateral security for the Obligations all of the Mortgagor's rights and benefits under any and all Leases (as hereinafter defined) and any and all rents and other amounts now or hereafter owing with respect to the Leases or the use or occupancy of the Property. This collateral assignment shall be absolute and effective immediately, but the Mortgagor shall have a license, revocable by Lender, to continue to collect rents owing under the Leases until an Event of Default (as hereinafter defined) occurs and Lender exercises its rights and remedies to collect such rents as set forth herein.

**1.4 Conditions to Grant.** Lender shall have and hold the above granted Property unto and to the use and benefit of Lender, and its successors and assigns, forever; provided, however, the conveyances, grants and assignments contained in this Mortgage are upon the express condition that, if Mortgagor shall irrevocably pay and perform the Obligations in full, including, without limitation, all principal, interest and premium thereon and other charges, if applicable, in accordance with the terms and conditions in the Loan Documents (as hereinafter defined) and this Mortgage, shall pay and perform all other Obligations as set forth in this Mortgage and shall

abide by and comply with each and every covenant and condition set forth herein and in the Loan Documents, the conveyances, grants and assignments contained in this Mortgage shall be appropriately released and discharged.

**1.5 Property.** The term *"Property"*, as used in this Mortgage, shall mean that certain parcel of land and the fixtures, structures and improvements and all personal property constituting fixtures, as that term is defined in the *Uniform Commercial Code*, now or hereafter thereon located at the Address(es), as more particularly described in Exhibit A attached hereto, together with: (i) all rights now or hereafter existing, belonging, pertaining or appurtenant thereto; (ii) the following categories of assets as defined in the Uniform Commercial Code: goods (including inventory, equipment and any accessions thereto), instruments (including promissory notes), documents, accounts (including health-care-insurance receivables), chattel paper (whether tangible or electronic), deposit accounts, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), securities and all other investment property, general intangibles (including payment intangibles and software), supporting obligations and any and all proceeds of any thereof, whether now owned or hereafter acquired, that are located on or used in connection with, or that arise in whole or in part out of the Mortgagor's use of or business conducted on or respecting, the Property and any substitutions, replacements, accessions and proceeds of any of the foregoing; (iii) all judgments, awards of damages and settlements hereafter made as a result or in lieu of any Taking, as hereinafter defined); (iv) all of the rights and benefits of the Mortgagor under any present or future leases and agreements relating to the Property, including, without limitation, rents, issues and profits, or the use or occupancy thereof together with any extensions and renewals thereof, specifically excluding all duties or obligations of the Mortgagor of any kind arising thereunder (the *"Leases"*); and (v) all contracts, permits and licenses respecting the use, operation or maintenance of the Property.

**1.6 Obligations.** The term *"Obligation(s)"*, as used in this Mortgage, shall mean, without limitation, all loans, advances, indebtedness, notes, liabilities and amounts, liquidated or unliquidated, now or hereafter owing by the Mortgagor to Lender at any time, of each and every kind, nature and description, whether arising under this Mortgage or otherwise, and whether secured or unsecured, direct or indirect (that is, whether the same are due directly by the Mortgagor to Lender; or are due indirectly by the Mortgagor to Lender as endorser, guarantor or other surety, or as obligor of obligations due third persons which have been endorsed or assigned to Lender, or otherwise), absolute or contingent, due or to become due, now existing or hereafter contracted, including, without limitation, payment of $316,750.00 of the amounts outstanding pursuant to the terms of the Loan Documents as set forth herein. Said term shall also include all interest and other charges chargeable to the Mortgagor or due from the Mortgagor to Lender from time to time and all advances, costs and expenses referred to in this Mortgage, including without limitation the costs and expenses (including reasonable attorney's fees) of enforcement of Lender's rights hereunder or pursuant to any document or instrument executed in connection herewith.

**1.7 Cross-Collateral and Future Advances.** It is the express intention of the Mortgagor that this Mortgage secure payment and performance of all of the Obligations, whether now existing or hereinafter incurred by reason of future advances by Lender or otherwise, and regardless of whether such Obligations are or were contemplated by the parties at the time of the granting of this Mortgage. Notice of the continuing grant of this Mortgage shall not be required to be stated on the face of any document evidencing any of the Obligations, nor shall such documents be required to otherwise specify that they are secured hereby.

**1.8 Open-End Mortgage.** Lender and the Mortgagor agree that:

(A) This Mortgage is an open-end mortgage pursuant to 42 *PA. C.S.A.* § 8143, and secures, inter alia, present and future advances made by Lender pursuant to the Loan Documents, including, without limitation, advances for the payment of taxes, assessments, maintenance charges, insurance premiums or costs incurred for the protection of the Property or the lien of this Mortgage, or expenses incurred by Lender by reason of default by the Mortgagor, and to enable any completion of the improvements comprising the Property as may be contemplated by the Loan Documents. Nothing contained herein shall impose any obligation on the part of Lender to make any such additional loan(s) to Mortgagor.

(B) Without limiting any other provisions of this Mortgage, this Mortgage secures present and future loans, advances and extensions of credit made by Lender to or for the benefit of Mortgagor, and the lien of such future advances shall relate back to the date of this Mortgage. This Mortgage shall also secure additional loans hereafter made by Lender to or for the benefit of Mortgagor. Nothing contained herein shall impose any obligation on the part of Lender to make any such additional loans, advances and extensions of credit to or for the benefit of Mortgagor.

(C) If the Mortgagor sends a written notice to Lender which purports to limit the indebtedness secured by this Mortgage and to release the obligation of Lender to make any additional advances to Mortgagor, such notice shall be ineffective as to any future advances made to pay: (i) taxes, assessments, maintenance charges and insurance premiums; (ii) costs incurred for the protection of the Property or the lien of this Mortgage, (iii) expenses incurred by Lender by reason of the default of Mortgagor, (iv) any other costs incurred by Mortgagor to protect and preserve the Property and (v) for all or part of the cost of completing any erection, construction, alteration or repair of any part of the Property. It is the intention of the parties hereto that any such advance made by Lender after any such notice by Mortgagor shall be secured by the lien of this Mortgage on the Property.

## 2. Representations, Warranties, Covenants

**2.1 Representations and Warranties.** The Mortgagor represents and warrants that:

(A) This Mortgage has been duly executed and delivered by the Mortgagor and is the legal, valid and binding obligation of the Mortgagor enforceable in accordance with its terms, except as limited by bankruptcy, insolvency, reorganization, moratorium or other laws affecting the enforcement of creditors' rights generally;

(B) The Mortgagor is the sole legal owner of the Property, holding good and marketable fee simple title to the Property, subject to no liens, encumbrances, leases, security interests or rights of others, other than as set forth in detail in Exhibit B hereto (the *"Permitted Encumbrances"*);

(C) The Mortgagor is the sole legal owner of the entire lessor's interest in Leases, if any, with full power and authority to encumber the Property in the manner set forth herein, and the Mortgagor has not executed any other assignment of Leases or any of the rights or rents arising thereunder;

(D) As of the date hereof, there are no Hazardous Substances (as hereinafter defined) in, on or under the Property, except as disclosed in writing to and acknowledged by Lender; and

(E) Each Obligation is a commercial obligation and does not represent a loan used for personal, family or household purposes and is not a consumer transaction.

**2.2 Recording; Further Assurances.** The Mortgagor covenants that it shall, at its sole cost and expense and upon the request of Lender, cause this Mortgage, and each amendment, modification or supplement hereto, to be recorded and filed in such manner and in such places, and shall at all times comply with all such statutes and regulations as may be required by law in order to establish, preserve and protect the interest of Lender in the Property and the rights of Lender under this Mortgage. Mortgagor will from time to time execute and deliver to Lender such documents, and take or cause to be taken, all such other or further action, as Lender may request in order to effect and confirm or vest more securely in Lender all rights contemplated by this Mortgage (including, without limitation, to correct clerical errors) or to vest more fully in, or assure to Lender the security interest in, the Property or to comply with applicable statute or law. To the extent permitted by applicable law, Mortgagor authorizes Lender to file financing statements, continuation statements or amendments, and any such financing statements, continuation statements or amendments may be filed at any time in any jurisdiction. Lender may at any time and from time to time file financing statements, continuation statements and amendments thereto that describe the Property as defined in this Mortgage and which contain any other information required by Article 9 of the *Uniform Commercial Code* for the sufficiency or filing office acceptance of any financing statement, continuation statement or amendment, including whether Mortgagor is an organization, the type of organization and any organization identification number issued to Mortgagor; Mortgagor also authorizes Lender to file financing statements describing any agricultural liens or other statutory liens held by Lender. Mortgagor agrees to furnish any such information to Lender promptly upon request. In addition, Mortgagor shall at any time and from time to time, take such steps as Lender may reasonably request for Lender (i) to obtain an acknowledgment, in form and substance satisfactory to Lender, of any bailee having possession of any of the Property that the bailee holds such Property for Lender,

and (ii) otherwise to insure the continued perfection and priority of Lender's security interest in any of the Property and the preservation of its rights therein. Mortgagor hereby constitutes Lender its attorney-in-fact to execute and file all filings required or so requested for the foregoing purposes, all acts of such attorney being hereby ratified and confirmed; and such power, being coupled with an interest, shall be irrevocable until this Mortgage terminates in accordance with its terms, all Obligations are paid in full and the Property is released.

**2.3 Restrictions on the Mortgagor.** The Mortgagor covenants that it will not, nor will it permit any other person to, directly or indirectly, without the prior written approval of Lender in each instance:

(A) Sell, convey, assign, transfer, mortgage, pledge, hypothecate, lease or dispose of all or any part of any legal or beneficial interest in the Mortgagor or the Property or any part thereof or permit any of the foregoing, except as expressly permitted by the terms of this Mortgage;

(B) Permit the use, generation, treatment, storage, release or disposition of any oil or other material or substance constituting hazardous waste or hazardous materials or substances under any applicable Federal or state law, regulation or rule (*"Hazardous Substances"*); or

(C) Permit to be created or suffer to exist any mortgage, lien, security interest, attachment or other encumbrance or charge on the Property or any part thereof or interest therein (except for the Permitted Encumbrances), including, without limitation, (i) any lien arising under any Federal, state or local statute, rule, regulation or law pertaining to the release or cleanup of Hazardous Substances and (ii) any mechanics' or materialmen's lien. The Mortgagor further agrees to give Lender prompt written notice of the imposition, or notice, of any lien referred to in this Section and to take any action necessary to secure the prompt discharge or release of the same. The Mortgagor agrees to defend its title to the Property and Lender's interest therein against the claims of all persons and, unless Lender requests otherwise, to appear in and diligently contest, at the Mortgagor's sole cost and expense, any action or proceeding that purports to affect the Mortgagor's title to the Property or the priority or validity of this Mortgage or Lender's interest hereunder.

**2.4 Operation of Property.** The Mortgagor covenants and agrees as follows:

(A) The Mortgagor will not permit the Property to be used for any unlawful or improper purpose, will at all times comply with all Federal, state and local laws, ordinances and regulations, and the provisions of any Lease, easement or other agreement affecting all or any part of the Property, and will obtain and maintain all governmental or other approvals relating to the Mortgagor, the Property or the use thereof, including without limitation, any applicable zoning or building codes or regulations and any laws or regulations relating to the handling, storage, release or cleanup of Hazardous Substances, and will give prompt written notice to Lender of (i) any violation of any such law, ordinance or

regulation by the Mortgagor or relating to the Property, (ii) receipt of notice from any
Federal, state or local authority alleging any such violation and (iii) the presence or
release on the Property of any Hazardous Substances;

(B) The Mortgagor will at all times keep the Property insured for such losses or damage,
in such amounts and by such companies as may be required by law and which Lender
may require, provided that, in any case, the Mortgagor shall maintain: (i) physical hazard
insurance on an "all risks" basis in an amount not less than 100% of the full replacement
cost of the Property; (ii) flood insurance if and as required by applicable Federal law
and as otherwise required by Lender; (iii) comprehensive commercial general liability
insurance; (iv) rent loss and business interruption insurance; and (v) such other insurance
as Lender may require from time to time, including builder's risk insurance in the case of
construction loans. All policies regarding such insurance shall be issued by companies
licensed to do business in the state where the policy is issued and also in the state where
the Property is located, be otherwise acceptable to Lender, provide deductible amounts
acceptable to Lender, name Lender as mortgagee, loss payee and additional insured,
and provide that no cancellation or material modification of such policies shall occur
without at least thirty (30) days prior written notice to Lender. Such policies shall include
(i) a mortgage endorsement determined by Lender in good faith to be equivalent to the
"standard" mortgage endorsement so that the insurance, as to the interest of Lender, shall
not be invalidated by any act or neglect of the Mortgagor or the owner of the Property,
any foreclosure or other proceedings or notice of sale relating to the Property, any change
in the title to or ownership of the Property, or the occupation or use of the Property for
purposes more hazardous than are permitted at the date of inception of such insurance
policies; (ii) a replacement cost endorsement; (iii) an agreed amount endorsement; (iv)
a contingent liability from operation endorsement; and (v) such other endorsements as
Lender may request. The Mortgagor will furnish to Lender upon request such original
policies, certificates of insurance or other evidence of the foregoing as are acceptable to
Lender. The terms of all insurance policies shall be such that no coinsurance provisions
apply, or if a policy does contain a coinsurance provision, the Mortgagor shall insure the
Property in an amount sufficient to prevent the application of the coinsurance provisions;

(C) Mortgagor will not enter into or modify the Leases in any material respect without the
prior written consent of Lender, execute any assignment of the Leases except in favor of
Lender, or accept any rentals under any Lease for more than one month in advance and
will at all times perform and fulfill every term and condition of the Leases;

(D) Mortgagor will at all times (i) maintain complete and accurate records and books
regarding the Property in accordance with generally accepted accounting principles and
(ii) permit Lender and Lender's agents, employees and representatives, at such reasonable
times as Lender may request, to enter and inspect the Property and such books and
records; and

(E) Mortgagor will at all times keep the Property in good and first-rate repair and condition (damage from casualty not excepted) and will not commit or permit any strip, waste, impairment, deterioration or alteration of the Property or any part thereof.

**2.5 Payments.** The Mortgagor covenants to pay when due: all Federal, state, municipal, real property and other taxes, betterment and improvement assessments and other governmental levies, water rates, sewer charges, insurance premiums and other charges on the Property, this Mortgage or any Obligation secured hereby that could, if unpaid, result in a lien on the Property or on any interest therein. If and when requested by Lender, the Mortgagor shall deposit from time to time with Lender sums determined by Lender to be sufficient to pay when due the amounts referred to in this Section. The Mortgagor shall have the right to contest any notice, lien, encumbrance, claim, tax, charge, betterment assessment or premium filed or asserted against or relating to the Property; provided that it contests the same diligently and in good faith and by proper proceedings and, at Lender's request, provides Lender with adequate cash security, in Lender's reasonable judgment, against the enforcement thereof. The Mortgagor shall furnish to Lender the receipted real estate tax bills or other evidence of payment of real estate taxes for the Property within thirty (30) days prior to the date from which interest or penalty would accrue for nonpayment thereof. The Mortgagor shall also furnish to Lender evidence of all other payments referred to above within fifteen (15) days after written request therefor by Lender. If Mortgagor shall fail to pay such sums, Lender may, but shall not be obligated to, advance such sums. Any sums so advanced by Lender shall be added to the Obligations, shall bear interest at the highest rate specified in any note evidencing the Obligations, and shall be secured by the lien of this Mortgage.

**2.6 Notices; Notice of Default.** The Mortgagor will deliver to Lender, promptly upon receipt of the same, copies of all notices or other documents it receives that affect the Property or its use, or claim that the Mortgagor is in default in the performance or observance of any of the terms hereof or that the Mortgagor or any tenant is in default of any terms of the Leases. The Mortgagor further agrees to deliver to Lender written notice promptly upon the occurrence of any Event of Default hereunder or event that with the giving of notice or lapse of time, or both, would constitute an Event of Default hereunder.

**2.7 Takings.** In case of any condemnation or expropriation for public use of, or any damage by reason of the action of any public or governmental entity or authority to, all or any part of the Property (a *"Taking"*), or the commencement of any proceedings or negotiations that might result in a Taking, the Mortgagor shall immediately give written notice to Lender, describing the nature and extent thereof. Lender may, at its option, appear in any proceeding for a Taking or any negotiations relating to a Taking and the Mortgagor shall immediately give to Lender copies of all notices, pleadings, determinations and other papers relating thereto. The Mortgagor shall in good faith and with due diligence and by proper proceedings file and prosecute its claims for any award or payment on account of any Taking. The Mortgagor shall not settle any such claim without Lender's prior written consent. The Mortgagor shall hold any amounts received with

respect to such awards or claims, by settlement, judicial decree or otherwise, in trust for Lender and immediately pay the same to Lender. The Mortgagor authorizes any award or settlement due in connection with a Taking to be paid directly to Lender in amounts not exceeding the Obligations. Lender may apply such amounts to the Obligations in such order as Lender may determine.

**2.8 Insurance Proceeds.** The proceeds of any insurance resulting from any loss with respect to the Property shall be paid to Lender and, at the option of Lender, be applied to the Obligations in such order as Lender may determine; provided, however, that if Lender shall require repair of the Property, Lender may release all or any portion of such proceeds to the Mortgagor for such purpose. Any insurance proceeds paid to the Mortgagor shall be held in trust for Lender and promptly paid to it.

# 3. Certain Rights of Lender

**3.1 Legal Proceedings.** Lender shall have the right, but not the duty, to intervene or otherwise participate in any legal or equitable proceeding that, in Lender's reasonable judgment, might affect the Property or any of the rights created or secured by this Mortgage. Lender shall have such right whether or not there shall have occurred an Event of Default hereunder.

**3.2 Appraisals/Assessments.** Lender shall have the right, at the Mortgagor's sole cost and expense, to obtain appraisals, environmental site assessments or other inspections of the portions of the Property that are real estate at such times as Lender deems necessary or as may be required by applicable law, or its prevailing credit or underwriting policies.

**3.3 Financial Statements.** Lender shall have the right, at the Mortgagor's sole cost and expense, to require delivery of financial statements in form and substance acceptable to Lender from the Mortgagor or any guarantor of any of the Obligations and the Mortgagor hereby agrees to deliver such financial statements and/or cause any such guarantor to so deliver any such financial statement when required by Lender.

**3.4 Leases and Rent Roll.** The Mortgagor shall deliver to Lender (i) during each calendar year and at such other times as Lender shall request a rent roll for the Property, in form acceptable to Lender, listing all tenants and occupants and describing all of the Leases; and (ii) at such times as Lender shall request executed copies of all the Leases.

# 4. Defaults and Remedies

**4.1 Events of Default.** *"Event of Default"* shall mean the occurrence of any one or more of the following events:

(A) default of any liability, obligation, covenant or undertaking of the Mortgagor or any guarantor of the Obligations to Lender, hereunder or otherwise, including, without limitation, failure to pay in full and when due any installment of principal or interest or default of the Mortgagor or any guarantor of the Obligations under any other Loan Document or any other agreement with Lender;

(B) failure by the Mortgagor or any guarantor of the Obligations to perform, observe or comply with any of the covenants, agreements, terms or conditions set forth in this Mortgage or the Loan Documents;

(C) the (i) occurrence of any material loss, theft, damage or destruction of, or (ii) issuance or making of any levy, seizure, attachment, execution or similar process on a material portion of the Property;

(D) receipt by Lender of notice from the Mortgagor or any holder of any subordinate lien on the Property intended to terminate, limit or affect in any manner the indebtedness secured by this Mortgage or the lien priority hereof

(E) failure of the Mortgagor or any guarantor of the Obligations to maintain aggregate collateral security value satisfactory to Lender;

(F) default of any material liability, obligation or undertaking of the Mortgagor or any guarantor of the Obligations to any other party;

(G) any statement, representation or warranty heretofore, now or hereafter made by the Mortgagor or any guarantor of the Obligations in connection with this Mortgage or in any supporting financial statement of the Mortgagor or any guarantor of the Obligations shall be determined by Lender to have been false or misleading in any material respect when made;

(H) if the Mortgagor or any guarantor of the Obligations is a corporation, trust, partnership or limited liability company, the liquidation, termination or dissolution of any such organization, or the merger or consolidation of such organization into another entity, or its ceasing to carry on actively its present business or the appointment of a receiver for its property;

(I) the death of the Mortgagor or any guarantor of the Obligations and, if the Mortgagor or any guarantor of the Obligations is a partnership or limited liability company, the death of any partner or member;

(J) the institution by or against the Mortgagor or any guarantor of the Obligations of any proceedings under the *Bankruptcy Code* 11 USC §101 *et seq.* or any other law in which the Mortgagor or any guarantor of the Obligations is alleged to be insolvent or unable to pay its debts as they mature, or the making by the Mortgagor or any guarantor of the Obligations of an assignment for the benefit of creditors or the granting by the Mortgagor or any guarantor of the Obligations of a trust mortgage for the benefit of creditors;

(K) the service upon Lender of a writ in which Lender is named as trustee of the Mortgagor or any guarantor of the Obligations;

(L) a judgment or judgments for the payment of money shall be rendered against the Mortgagor or any guarantor of the Obligations, and any such judgment shall remain unsatisfied and in effect for any period of thirty (30) consecutive days without a stay of execution;

Real Estate Security Instrument-Commercial
Bankers Systems™ VMP®
Wolters Kluwer Financial Services © 2014
2020022720.1.1.2859-J20180529Y
02/2018
Page 10 of 21

(M) any levy, lien (including mechanics lien), seizure, attachment, execution or similar process shall be issued or levied on any of the property of the Mortgagor or any guarantor of the Obligations;

(N) the termination or revocation of any guaranty of the Obligations; or

(O) the occurrence of such a change in the condition or affairs (financial or otherwise) of the Mortgagor or any guarantor of the Obligations, or the occurrence of any other event or circumstance, such that Lender, in its sole discretion, deems that it is insecure or that the prospects for timely or full payment or performance of any obligation of the Mortgagor or any guarantor of the Obligations to Lender has been or may be impaired.

**4.2 Remedies.** On the occurrence of any Event of Default Lender may, at any time thereafter, at its option and, to the extent permitted by applicable law, without notice, exercise any or all of the following remedies:

(A) Declare the Obligations due and payable, and the Obligations shall thereupon become immediately due and payable, without presentment, protest, demand or notice of any kind, all of which are hereby expressly waived by the Mortgagor except for Obligations due and payable on demand, which shall be due and payable on demand whether or not an Event of Default has occurred hereunder;

(B) Enter, take possession of, manage and operate the Property (including all personal property and all records and documents pertaining thereto) and any part thereof and exclude the Mortgagor therefrom, take all actions it deems necessary or proper to preserve the Property and operate the Property as a mortgagee in possession with all the powers as could be exercised by a receiver or as otherwise provided herein or by applicable law; provided, however, the entry by Lender upon the Property for any reason shall not cause Lender to be a mortgagee in possession, except upon the express written declaration of Lender;

(C) With or without taking possession, receive and collect all rents, income, issues and profits (*"Rents"*) from the Property (including all real estate and personal property and whether past due or thereafter accruing), including as may arise under the Leases, and the Mortgagor appoints Lender as its true and lawful attorney with the power for Lender in its own name and capacity to demand and collect Rents and take any action that the Mortgagor is authorized to take under the Leases. Lender shall (after payment of all costs and expenses incurred) apply any Rents received by it to the Obligations in such order as Lender determines, or in accordance with any applicable statute, and the Mortgagor agrees that exercise of such rights and disposition of such funds shall not be deemed to cure any default or constitute a waiver of any foreclosure once commenced nor preclude the later commencement of foreclosure for breach thereof. Lender shall be liable to account only for such Rents actually received by Lender. Lessees under the Leases are

hereby authorized and directed, following notice from Lender, to pay all amounts due the Mortgagor under the Leases to Lender, whereupon such lessees shall be relieved of any and all duty and obligation to the Mortgagor with respect to such payments so made;

(D) In addition to any other remedies, to sell the Property or any part thereof or interest therein pursuant to exercise of its power of sale or otherwise at public auction on terms and conditions as Lender may determine, or otherwise foreclose this Mortgage in any manner permitted by law, and upon such sale the Mortgagor shall execute and deliver such instruments as Lender may request in order to convey and transfer all of the Mortgagor's interest in the Property, and the same shall operate to divest all rights, title and interest of the Mortgagor in and to the Property. In the event this Mortgage shall include more than one parcel of property or subdivision (each hereinafter called a *"Portion"*), Lender shall, in its sole and exclusive discretion and to the extent permitted by applicable law, be empowered to foreclose upon any such Portion without impairing its right to foreclose subsequently upon any other Portion or the entirety of the Property from time to time thereafter. In addition, Lender may in its sole and exclusive discretion subordinate this Mortgage to one or more Leases for the sole purpose of preserving any such Lease in the event of a foreclosure;

(E) Cause one or more environmental assessments to be taken, arrange for the cleanup of any Hazardous Substances or otherwise cure the Mortgagor's failure to comply with any statute, regulation or ordinance relating to the presence or cleanup of Hazardous Substances, and the Mortgagor shall provide Lender or its agents with access to the Property for such purposes; provided that the exercise of any of such remedies shall not be deemed to have relieved the Mortgagor from any responsibility therefor or given Lender "control" over the Property or cause Lender to be considered to be a mortgagee in possession, "owner" or "operator" of the Property for purposes of any applicable law, rule or regulation pertaining to Hazardous Substances; and

(F) Take such other actions or proceedings as Lender deems necessary or advisable to protect its interest in the Property and ensure payment and performance of the Obligations, including, without limitation, appointment of a receiver (and the Mortgagor hereby waives any right to object to such appointment) and exercise of any of Lender's remedies provided herein or in any other document evidencing, securing or relating to any of the Obligations or available to a secured party under the *Uniform Commercial Code* or under other applicable law.

In addition, the Lender shall have all other remedies provided by applicable law, including, without limitation, the right to pursue a judicial sale of the Property or any portion thereof by deed, assignment or otherwise.

The Mortgagor agrees and acknowledges that the acceptance by the Lender of any payments from either the Mortgagor or any guarantor after the occurrence of any Event of Default, the exercise by the Lender of any remedy set forth herein or the commencement, discontinuance

or abandonment of foreclosure proceedings against the Property shall not waive the Lender's subsequent or concurrent right to foreclose or operate as a bar or estoppel to the exercise of any other rights or remedies of the Lender. The Mortgagor agrees and acknowledges that the Lender, by making payments or incurring costs described herein, shall be subrogated to any right of the Mortgagor to seek reimbursement from any third parties, including, without limitation, any predecessor in interest to the Mortgagor's title or other party who may be responsible under any law, regulation or ordinance relating to the presence or cleanup of Hazardous Substances.

**4.3** ACTION IN EJECTMENT.

FOR THE PURPOSE OF OBTAINING POSSESSION OF THE PROPERTY IN THE EVENT OF ANY EVENT OF DEFAULT HEREUNDER, MORTGAGOR HEREBY AUTHORIZES AND EMPOWERS ANY ATTORNEY OF ANY COURT OF RECORD IN THE COMMONWEALTH OF PENNSYLVANIA OR ELSEWHERE, AS ATTORNEY FOR MORTGAGOR AND ALL PERSONS CLAIMING UNDER OR THROUGH MORTGAGOR, TO APPEAR FOR AND CONFESS JUDGMENT AGAINST MORTGAGOR, AND AGAINST ALL PERSONS CLAIMING UNDER OR THROUGH MORTGAGOR, IN AN ACTION IN EJECTMENT FOR POSSESSION OF THE PROPERTY, IN FAVOR OF THE LENDER, FOR WHICH THIS MORTGAGE, OR A COPY THEREOF VERIFIED BY AFFIDAVIT, SHALL BE A SUFFICIENT WARRANT; AND THEREUPON A WRIT OF POSSESSION MAY IMMEDIATELY ISSUE FOR POSSESSION OF THE PROPERTY, WITHOUT ANY PRIOR WRIT OR PROCEEDING WHATSOEVER AND WITHOUT ANY STAY OF EXECUTION OR APPEAL. IF FOR ANY REASON AFTER SUCH ACTION HAS BEEN COMMENCED IT SHALL BE DISCONTINUED, OR POSSESSION OF THE PROPERTY SHALL REMAIN IN OR BE RESTORED TO MORTGAGOR, THE LENDER SHALL HAVE THE RIGHT FOR THE SAME DEFAULT OR ANY SUBSEQUENT DEFAULT TO BRING ONE OR MORE FURTHER ACTIONS AS ABOVE PROVIDED TO RECOVER POSSESSION OF THE PROPERTY. THE LENDER MAY CONFESS JUDGMENT IN AN ACTION IN EJECTMENT BEFORE OR AFTER THE INSTITUTION OF PROCEEDINGS TO FORECLOSE THIS MORTGAGE OR TO ENFORCE ANY OF THE LOAN DOCUMENTS, OR AFTER ENTRY OF JUDGMENT THEREIN OR ON ANY OF THE LOAN DOCUMENTS, OR AFTER A SHERIFF'S SALE OR JUDICIAL SALE OR OTHER FORECLOSURE SALE OF THE PROPERTY IN WHICH THE LENDER IS THE SUCCESSFUL BIDDER, IT BEING THE UNDERSTANDING OF THE PARTIES THAT THE AUTHORIZATION TO PURSUE SUCH PROCEEDINGS FOR CONFESSION OF JUDGMENT THEREIN IS AN ESSENTIAL PART OF THE REMEDIES FOR ENFORCEMENT OF THIS MORTGAGE AND THE OTHER LOAN DOCUMENTS, AND SHALL SURVIVE ANY EXECUTION SALE TO THE LENDER.

MORTGAGOR HEREBY RELEASES AND AGREES TO RELEASE LENDER AND SAID ATTORNEYS FROM ALL PROCEDURAL ERRORS AND DEFECTS WHATSOEVER IN ENTERING SUCH JUDGMENT OR JUDGMENTS OR IN CAUSING SUCH WRITS OR PROCESS TO BE ISSUED OR IN ANY PROCEEDING THEREON OR CONCERNING THE SAME, PROVIDED THAT LENDER SHALL HAVE FILED IN SUCH ACTION OR ACTIONS

AN AFFIDAVIT OR AFFIDAVITS MADE BY SOMEONE ON LENDER'S BEHALF SETTING FORTH THE FACTS NECESSARY TO AUTHORIZE THE ENTRY OF SUCH JUDGMENT OR JUDGMENTS ACCORDING TO THE TERMS OF THIS INSTRUMENT, OF WHICH FACTS SUCH AFFIDAVIT OR AFFIDAVITS SHALL BE PRIMA FACIE EVIDENCE.

MORTGAGOR CONFIRMS TO THE LENDER THAT (I) MORTGAGOR IS A BUSINESS ENTITY AND THAT ITS PRINCIPALS ARE KNOWLEDGEABLE IN BUSINESS MATTERS; (II) THE TERMS OF THIS MORTGAGE, INCLUDING THE FOREGOING WARRANT OF ATTORNEY TO CONFESS JUDGMENT, HAVE BEEN NEGOTIATED AND AGREED UPON IN A COMMERCIAL CONTEXT; AND (III) MORTGAGOR HAS FULLY REVIEWED THE AFORESAID WARRANT OF ATTORNEY TO CONFESS JUDGMENT WITH ITS OWN COUNSEL AND IS KNOWINGLY AND VOLUNTARILY WAIVING CERTAIN RIGHTS IT WOULD OTHERWISE POSSESS, INCLUDING BUT NOT LIMITED TO, THE RIGHT TO ANY NOTICE OF A HEARING PRIOR TO THE ENTRY OF JUDGMENT BY THE LENDER PURSUANT TO THE FOREGOING WARRANT.

**4.4 Advances.** If the Mortgagor fails to pay or perform any of its obligations respecting the Property, Lender may in its sole discretion do so without waiving or releasing Mortgagor from any such obligation. Any such payments may include, but are not limited to, payments for taxes, assessments and other governmental levies, water rates, insurance premiums, maintenance, repairs or improvements constituting part of the Property. Any amounts paid by Lender hereunder shall be, until reimbursed by the Mortgagor, part of the Obligations and secured by this Mortgage, and shall be due and payable to Lender, on demand, together with interest thereon to the extent permitted by applicable law, at the highest rate permitted under any of the notes evidencing the Obligations.

**4.5 Cumulative Rights and Remedies.** All of the foregoing rights, remedies and options (including without limitation the right to enter and take possession of the Property, the right to manage and operate the same, and the right to collect Rents, in each case whether by a receiver or otherwise) are cumulative and in addition to any rights Lender might otherwise have, whether at law or by agreement, and may be exercised separately or concurrently and none of which shall be exclusive of any other. The Mortgagor further agrees that Lender may exercise any or all of its rights or remedies set forth herein without having to pay the Mortgagor any sums for use or occupancy of the Property.

**4.6 Mortgagor's Waiver of Certain Rights.** To the extent permitted by applicable law, the Mortgagor hereby waives the benefit of all present and future laws (i) providing for any appraisal before sale of all or any portion of the Property or (ii) in any way extending the time for the enforcement of the collection of the Obligations or creating or extending a period of redemption from any sale made hereunder.

# 5. Miscellaneous

**5.1 Costs and Expenses.** To the extent permitted by applicable law, the Mortgagor shall pay to Lender, on demand, all reasonable expenses (including attorneys' fees and expenses and reasonable consulting, accounting, appraisal, brokerage and similar professional fees and charges) incurred by the Lender in connection with Lender's interpretation, recordation of this Mortgage, exercise, preservation or enforcement of any of its rights, remedies and options set forth in this Mortgage and in connection with any litigation, proceeding or dispute whether arising hereunder or otherwise relating to the Obligations, together with interest thereon to the extent permitted by applicable law, until paid in full by the Mortgagor at the highest rate set forth in any of the notes evidencing the Obligations. Any amounts owed by the Mortgagor hereunder shall be, until paid, part of the Obligations and secured by this Mortgage, and Lender shall be entitled, to the extent permitted by law, to receive and retain such amounts in any action for a deficiency against or redemption by the Mortgagor, or any accounting for the proceeds of a foreclosure sale or of insurance proceeds.

**5.2 Indemnification Regarding Leases.** The Mortgagor hereby agrees to defend, and does hereby indemnify and hold Lender and each of its directors, officers, employees, agents and attorneys (each an *"Indemnitee"*) harmless from all losses, damages, claims, costs or expenses (including attorneys' fees and expenses) resulting from the assignment of the Leases and from all demands that may be asserted against such Indemnitees arising from any undertakings on the part of Lender to perform any obligations under the Leases. It is understood that the assignment of the Leases shall not operate to place responsibility for the control or management of the Property upon Lender or any Indemnitee or make them liable for performance of any of the obligations of the Mortgagor under Leases, respecting any condition of the Property or any other agreement or arrangement, written or oral, or applicable law.

**5.3 Indemnification Regarding Hazardous Substances.** The Mortgagor hereby agrees to defend, and does hereby indemnify and hold harmless each Indemnitee from and against any and all losses, damages, claims, costs or expenses, including, without limitation, litigation costs and attorneys' fees and expenses and fees or expenses of any environmental engineering or cleanup firm incurred by such Indemnitee and arising out of or in connection with the Property or resulting from the application of any current or future law, regulation or ordinance relating to the presence or cleanup of Hazardous Substances on or affecting the Property. The Mortgagor agrees its obligations hereunder shall be continuous and shall survive termination or discharge of this Mortgage and/or the repayment of all debts to Lender including repayment of all Obligations.

**5.4 Indemnitee's Expenses.** If any Indemnitee is made a party defendant to any litigation or any claim is threatened or brought against such Indemnitee concerning this Mortgage or the Property or any part thereof or therein or concerning the construction, maintenance, operation or the occupancy or use thereof by the Mortgagor or other person or entity, then the Mortgagor shall indemnify, defend and hold each Indemnitee harmless from and against all liability by reason of said litigation or claims, including attorneys' fees and expenses incurred by such Indemnitee

in connection with any such litigation or claim, whether or not any such litigation or claim is prosecuted to judgment. The within indemnification shall survive payment of the Obligations, and/or any termination, release or discharge executed by Lender in favor of the Mortgagor.

**5.5 Waivers.** The Mortgagor waives notice of nonpayment, demand, presentment, protest or notice of protest of the Obligations and all other notices, consents to any renewals or extensions of time of payment thereof, and generally waives any and all suretyship defenses and defenses in the nature thereof. No delay or omission of Lender in exercising or enforcing any of its rights, powers, privileges, remedies, immunities or discretion (all of which are hereinafter collectively referred to as *"Lender's Rights and Remedies"*) hereunder shall constitute a waiver thereof; and no waiver by Lender of any default of the Mortgagor hereunder or of any demand shall operate as a waiver of any other default hereunder or of any other demand. No term or provision hereof shall be waived, altered or modified except with the prior written consent of Lender, which consent makes explicit reference to this Mortgage. Except as provided in the preceding sentence, no other agreement or transaction, of whatsoever nature, entered into between Lender and the Mortgagor at any time (whether before, during or after the effective date or term of this Mortgage) shall be construed as a waiver, modification or limitation of any of Lender's Rights and Remedies under this Mortgage (nor shall anything in this Mortgage be construed as a waiver, modification or limitation of any of Lender's Rights and Remedies under any such other agreement or transaction) but all Lender's Rights and Remedies not only under the provisions of this Mortgage but also under any such other agreement or transaction shall be cumulative and not alternative or exclusive, and may be exercised by Lender at such time or times and in such order of preference as Lender in its sole discretion may determine.

**5.6 Waiver of Homestead.** To the maximum extent permitted under applicable law, the Mortgagor hereby waives and terminates any homestead rights and/or exemptions respecting the Property under the provisions of any applicable homestead laws, including without limitation, Title 42, Section 8123, of the *Pennsylvania Consolidated Statutes Annotated*.

**5.7 Joint and Several.** If there is more than one Mortgagor, each of them shall be jointly and severally liable for payment and/or performance of all obligations secured by this Mortgage and the term *"Mortgagor"* shall include each as well as all of them.

**5.8 Severability.** If any provision of this Mortgage or portion of such provision or the application thereof to any person or circumstance shall to any extent be held invalid or unenforceable, the remainder of this Mortgage (or the remainder of such provision) and the application thereof to other persons or circumstances shall not be affected thereby.

**5.9 Complete Agreement.** This Mortgage and the other Loan Documents constitute the entire agreement and understanding between and among the parties hereto relating to the subject matter hereof, and supersede all prior proposals, negotiations, agreements and understandings among the parties hereto with respect to such subject matter.

**5.10 Binding Effect of Agreement.** This Mortgage shall run with the land and be binding upon and inure to the benefit of the respective heirs, executors, administrators, legal representatives, successors and assigns of the parties hereto, and shall remain in full force and effect (and Lender shall be entitled to rely thereon) until all Obligations are fully and indefeasibly paid. Lender may transfer and assign this Mortgage and deliver any collateral to the assignee, who shall thereupon have all of the rights of Lender; and Lender shall then be relieved and discharged of any responsibility or liability with respect to this Mortgage and such collateral. Except as expressly provided herein or in the other Loan Documents, nothing, expressed or implied, is intended to confer upon any party, other than the parties hereto, any rights, remedies, obligations or liabilities under or by reason of this Mortgage or the other Loan Documents.

**5.11 Notices.** Any notices under or pursuant to this Mortgage shall be deemed duly received and effective if delivered in hand to any officer or agent of Mortgagor or Lender, or if mailed by registered or certified mail, return receipt requested, addressed to Mortgagor or Lender at the address set forth in this Mortgage or as any party may from time to time designate by written notice to the other party.

**5.12 Governing Law.** This Mortgage shall be governed by the laws of the Commonwealth of Pennsylvania.

**5.13 Reproductions.** This Mortgage and all documents which have been or may be hereinafter furnished by the Mortgagor to Lender may be reproduced by Lender by any photographic, photostatic, microfilm, xerographic or similar process, and any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding (whether or not the original is in existence and whether or not such reproduction was made in the regular course of business).

**5.14 Jurisdiction and Venue.** The Mortgagor irrevocably submits to the nonexclusive jurisdiction of any Federal or state court sitting in Pennsylvania, over any suit, action or proceeding arising out of or relating to this Mortgage. The Mortgagor irrevocably waives, to the fullest extent it may effectively do so under applicable law, any objection it may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in any such court and any claim that the same has been brought in an inconvenient forum. The Mortgagor hereby consents to process being served in any such suit, action or proceeding (i) by the mailing of a copy thereof by registered or certified mail, postage prepaid, return receipt requested, to the Mortgagor's address set forth herein or such other address as has been provided in writing to Lender and (ii) in any other manner permitted by law, and agrees that such service shall in every respect be deemed effective service upon the Mortgagor.

**5.15 JURY WAIVER.**

MORTGAGOR AND LENDER EACH HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY, AND AFTER AN OPPORTUNITY TO CONSULT WITH LEGAL COUNSEL, (A) WAIVE ANY AND ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING IN CONNECTION WITH THIS MORTGAGE, THE OBLIGATIONS, ALL MATTERS CONTEMPLATED HEREBY AND DOCUMENTS EXECUTED IN CONNECTION HEREWITH AND (B) AGREE NOT TO CONSOLIDATE ANY SUCH ACTION WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CAN NOT BE, OR HAS NOT BEEN WAIVED. MORTGAGOR CERTIFIES THAT NEITHER LENDER NOR ANY OF ITS REPRESENTATIVES, AGENTS OR COUNSEL HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT LENDER WOULD NOT IN THE EVENT OF ANY SUCH PROCEEDING SEEK TO ENFORCE THIS WAIVER OF RIGHT TO TRIAL BY JURY.

**5.16 Purchase Money Mortgage.** To the extent all or any part of the Obligations secured by this Mortgage were used in whole or in part to fund the acquisition of all or any part of the Property, this Mortgage shall be a *"purchase money mortgage"* within the meaning of *42 Pa. C.S.A.* Sec. 8141 and shall be accorded the lien priority provided for therein.

**Signatures.** Executed under seal as of February 28, 2020. This is a contract under seal and may be enforced under *42 Pa.C.S.* Section 5529(b).

**Mortgagor**

**Diamante Enterprises Limited Liability Company**
*a Pennsylvania limited liability company*

_Danielle Parker_     2/28/2020

**Danielle Parker**                          **Date**
*Managing Member*

_____
*Witness*

The address of the within named Lender is:

30699 Russell Ranch Road, Suite 295

Westlake Village, CA 91362

~~Velocity Commercial Capital, LLC~~ Settlement Agent
~~a California Limited Liability Company~~

_____    2/28/2020
                                    **Date**

_____
*Witness*

**Acknowledgment**

Commonwealth of Pennsylvania

County of _Philadelphia_

On _February 28, 2020_, before me, _Jamie Stafford-Thorne_ the undersigned officer, personally appeared Danielle Parker, who acknowledged himself/herself/themselves to be the Managing Member of Diamante Enterprises Limited Liability Company, a Pennsylvania limited liability company on behalf of the limited liability company, and that he/she/they, as such Managing Member, being authorized so to do, executed the foregoing instrument for the purposes therein contained, by signing the name of the Diamante Enterprises Limited Liability Company by himself/herself/themselves as Managing Member of Diamante Enterprises Limited Liability Company, a Pennsylvania limited liability company on behalf of the limited liability company.

In witness whereof I hereunto set my hand and official seal.

_____
*Notary Public*

_Jamie Stafford-Thorne_
*(Print Name)*

My commission expires: _Oct. 5, 2021_

Commonwealth of Pennsylvania - Notary Seal
JAMIE STAFFORD-THORNE, Notary Public
Delaware County
My Commission Expires October 5, 2021
Commission Number 1321378

## EXHIBIT "A"
## Property Description

See Legal Description attached hereto and made a part thereof

See Legal Description attached hereto and made a part thereof

**COMMITMENT FOR TITLE INSURANCE**

ISSUED BY
STEWART TITLE GUARANTY COMPANY

**SCHEDULE C**

The Land is described as follows:

All that certain piece or parcel of land situate lying and being in the City and County of Philadelphia more particularly described as follows:

SITUATE, on the South Side of Redner Street, at the distance 154 feetwestward from the West side of 30th Street in the 29th Ward of the City of Philadelphia.

CONTAINING in front or breadth on the said Redner Street 15 feet 4 inches and extending length or depth southward of that width between parallel lines at right angles with said Redner Street, 57 feet 3 inches including on the rear end thereof a certain 3 feet wide alley extending from said 30th Street to 31st Street.

For information purposes only: Known as 3020 Redner Stre4et, Philadelphia, PA

Parcel Number 32-4041400

All that certain piece or parcel of land situate lying and being in the City and County of Philadelphia more particularly described as follows:

SITUATE on the southerly side of Columbia Avenue, at the distance of 15 feet, 4 ½ inches westwardly from the westerly side of Dover Street in the 29th Ward of the City of Philadelphia, described according to a plan and survey thereof made on April 4, 1895, by W. K. Carlisle, Surveyors of the 7th District of said City as follows:

CONTAINING in front or breadth on the said Columbia Avenue, 15 feet 1 ½ inches and extending of that width southwardly between parallel lines at right angles to the said Columbia Avenue, 72 feet to the northerly side of a certain 3 feet wide alley which extends from 29th Street to the said Dover Street.

For information purposes only: Known as 2830 Cecil B. Moore Avenue, Philadelphia, PA

Parcel Number 32-4041400

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by Stewart Title Guaranty Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I - Requirements; and Schedule B, Part II - Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006 - 2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.



AMERICAN
LAND TITLE
ASSOCIATION

ALTA Commitment for Title Insurance (08-01-16)
Schedule C

122218-S-PA-MR-KF

Exhibit "B"

**Permitted Encumbrances**

Record and Return To:
Velocity Commercial Capital, LLC, A California Limited
Liability Company
Velocity Commercial Capital, LLC, A California Limited
Liability Company
30699 Russell Ranch Rd. Suite 295
Westlake Village, CA 91362
Property Address:
**3020 Redner Street**
**Philadelphia, PA 19121**
Loan #: **6723047871**

---

### ASSIGNMENT OF Open-End Mortgage, Commercial Mortgage, Security Agreement and Assignment of Leases and Rents

For good and valuable consideration, the sufficiency of which is hereby acknowledged, **U.S. Bank National Association, as Indenture Trustee for VCC 2020-MC1 Trust , 191 South LaSalle Street, 7th Floor, Chicago, IL 60603,** by these presents does convey, assign, and transfer and set over to:

**U.S. Bank National Association, as Indenture Trustee for VCC 2022MC-1 Trust,**
**191 South LaSalle Street, 7th Floor  Chicago, IL 60603,** the following described Mortgage, with all interest, all liens, and any rights due or to become due thereon. Said Mortgage for **$316,750** is recorded in the State of **PENNSYLVANIA**, County of **Philadelphia** Official Records, dated **02/28/2020** and recorded on **03/16/2020**, as Instrument No. **53645815**

Original Mortgagor: **Diamante Enterprises Limited Liability Company**

Original Mortgagee: **Velocity Commercial Capital, LLC, a California Limited Liability Company**

Legal Description: **The Land is described as follows: All that certain piece or parcel of land situate lying and being in the City and County of Philadelphia more particularly described as follows: SITUATE, on the South Side of Redner Street, at the distance 154 feetwestward from the West side of 30th Street in the 29th Ward of the City of Philadelphia. CONTAINING in front or breadth on the said Redner Street 15 feet 4 inches and extending length or depth southward of that width between parallel lines at right angles with said Redner Street, 57 feet 3 inches including on the rear end thereof a certain 3 feet wide alley extending from said 30th Street to 31st Street. For information purposes only: Known as 3020 Redner Stre4ct, Philadelphia, PA Parcel Number 32-4041400 All that certain piece or parcel of land situate lying and being in the City and County of Philadelphia more particularly described as follows: SITUATE on the southerly side of Columbia Avenue, at the distance of 15 feet, 4 ½ inches westwardly from the westerly side of Dover Street in the 29th Ward of the City of Philadelphia, described according to a plan and survey thereof made on April 4, 1895, by W. K. Carlisle, Surveyors of the 7th District of said City as follows: CONTAINING in front or breadth on the said Columbia Avenue, 15 feet 1 ½ inches and extending of that width southwardly between parallel lines at right angles to the said Columbia Avenue, 72 feet to the northerly side of a certain 3 feet wide alley which extends from 29th Street to the said Dover Street. For information purposes only: Known as 2830 Cecil B. Moore Avenue, Philadelphia, PA Parcel Number 32-4041400**

Date: **05/12/2023.**

**Velocity Commercial Capital, LLC, A California**
**Limited Liability Company**

By: _____

Name: **Ryan Wise**
Title: **Director, Capital Markets**

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF **California**
COUNTY OF **Los Angeles** } s.s.

On **05/12/2023,** before me, **Jason Conchas Jara,** Notary Public, personally appeared **Ryan Wise,** who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

Witness my hand and official seal.

Notary Public: **Jason Conchas Jara**
My Commission Expires: **04/25/2026**
Commission #: **2402016**

Drafted By: **Travis Baum**

CERTIFICATE OF RESIDENCE

The undersigned does hereby certify that the precise address of the Mortgagee is: **191 South LaSalle Street, 7th Floor , Chicago, IL 60603**

BY:

_____

Ryan Wise

Record and Return To:

Velocity Commercial Capital, LLC, A California Limited
Liability Company
Velocity Commercial Capital, LLC, A California Limited
Liability Company
30699 Russell Ranch Rd. Suite 295
Westlake Village, CA 91362
Property Address:
**3020 Redner Street**
**Philadelphia, PA 19121**
Loan #: **6723047871**

---

### ASSIGNMENT OF Open-End Mortgage, Commercial Mortgage, Security Agreement and Assignment of Leases and Rents

For good and valuable consideration, the sufficiency of which is hereby acknowledged, **U.S. Bank National Association, as Indenture Trustee for VCC 2020-MC1 Trust , 191 South LaSalle Street, 7th Floor, Chicago, IL 60603,** by these presents does convey, assign, and transfer and set over to:

**U.S. Bank National Association, as Indenture Trustee for VCC 2022MC-1 Trust,**
**191 South LaSalle Street, 7th Floor  Chicago, IL 60603,** the following described Mortgage, with all interest, all liens, and any rights due or to become due thereon. Said Mortgage for **$316,750** is recorded in the State of **PENNSYLVANIA,** County of **Philadelphia** Official Records, dated **02/28/2020** and recorded on **03/16/2020,** as Instrument No. **53645815**

Original Mortgagor: **Diamante Enterprises Limited Liability Company**

Original Mortgagee: **Velocity Commercial Capital, LLC, a California Limited Liability Company**

 Legal Description: **The Land is described as follows: All that certain piece or parcel of land situate lying and being in the City and County of Philadelphia more particularly described as follows: SITUATE, on the South Side of Redner Street, at the distance 154 feetwestward from the West side of 30th Street in the 29th Ward of the City of Philadelphia. CONTAINING in front or breadth on the said Redner Street 15 feet 4 inches and extending length or depth southward of that width between parallel lines at right angles with said Redner Street, 57 feet 3 inches including on the rear end thereof a certain 3 feet wide alley extending from said 30th Street to 31st Street. For information purposes only: Known as 3020 Redner Stre4ct, Philadelphia, PA Parcel Number 32-4041400 All that certain piece or parcel of land situate lying and being in the City and County of Philadelphia more particularly described as follows: SITUATE on the southerly side of Columbia Avenue, at the distance of 15 feet, 4 ½ inches westwardly from the westerly side of Dover Street in the 29th Ward of the City of Philadelphia, described according to a plan and survey thereof made on April 4, 1895, by W. K. Carlisle, Surveyors of the 7th District of said City as follows: CONTAINING in front or breadth on the said Columbia Avenue, 15 feet 1 ½ inches and extending of that width southwardly between parallel lines at right angles to the said Columbia Avenue, 72 feet to the northerly side of a certain 3 feet wide alley which extends from 29th Street to the said Dover Street. For information purposes only: Known as 2830 Cecil B. Moore Avenue, Philadelphia, PA Parcel Number 32-4041400**

Date: **05/12/2023.**

**Velocity Commercial Capital, LLC, A California**
**Limited Liability Company**

By: _____

Name: **Ryan Wise**
Title: **Director, Capital Markets**

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF **California**
COUNTY OF **Los Angeles** } s.s.

On **05/12/2023**, before me, **Jason Conchas Jara,** Notary Public, personally appeared **Ryan Wise,** who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

Witness my hand and official seal.

Notary Public: **Jason Conchas Jara**
My Commission Expires: **04/25/2026**
Commission #: **2402016**

Drafted By: **Travis Baum**

CERTIFICATE OF RESIDENCE

The undersigned does hereby certify that the precise address of the Mortgagee is: **191 South LaSalle Street, 7th Floor , Chicago, IL 60603**

BY:

_____
Ryan Wise